**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X

DANIEL CLEMENT, On Behalf of himself and All
Others Similarly Situated,

C.A. No

Plaintiff,

**JURY TRIAL DEMANDED**

-against-

RITE AID CORPORATION,

Defendant.

-------------------------------------------------------------X

## CLASS ACTION COMPLAINT FOR VIOLATION OF GENERAL BUSINESS LAW SECTION 349

Plaintiff Daniel Clement ("Plaintiff") brings this action on behalf of himself and all others similarly situated consumers against Defendant Rite Aid Corporation upon actual knowledge as to his own acts and on information and belief as to all other allegations after due investigation by counsel, and states:

## NATURE OF ACTION

1.     Defendant manufactures, markets, sells, and distributes biotin supplements under the Rite Aid brand. Biotin is marketed as capsules containing 5,000 mcg. and 2,500 mcg.," ( collectively, the "Biotin Products"). (A "mcg" is a microgram or one millionth of a gram.)

2.     On the front of the Biotin Products, Rite Aid represents that these products: "Support[] Healthy Hair, Skin, and Nails." These representations are collectively referred to as the "health benefit representations." Defendant's health benefit representations are false, misleading and reasonably likely to deceive the public. Indeed, the sole active ingredient in Defendants' Biotin Products is biotin, but it does not provide the benefits advertised.

3.     Biotin is a colorless, water soluble B vitamin found in many foods, including several fruits and vegetables, liver, salmon, and cereals. Biotin serves as a biochemical co-factor (a helper of sorts) for certain enzymatic reactions and is involved in the metabolism of fats, carbohydrates, and amino acids.

4.     The human body only requires a finite amount of biotin on a daily basis for it to perform its enzymatic functions as there are a finite number of enzymes that use biotin. The amount needed is very small and is measured in micrograms. Once there is sufficient biotin in the body, saturation occurs and the body does not use this surplus biotin. The Institute of Medicine (US) Standing Committee on the Scientific Evaluation of Dietary Reference Intakes and its Panel on Folate, Other B Vitamins, and Choline("the Institute of Medicine") has set an adequate intake (AI) for biotin at 30 micrograms (mcg) per day for people 19 years and older and even less for younger people. (A microgram is 1 billionth of a gram.).

5.     While persons with exceedingly rare conditions that cause biotin deficiencies, or persons who chronically ingest inordinate amounts of raw egg whites, can require biotin supplementation, healthy people already have more than adequate, if not excessive, amounts of biotin derived from their diet naturally and require no supplement. No reputable medical professional recommends a large daily intake of biotin for healthy adults.

6.     Average biotin intake among North American adults is anywhere from 35-70 mcg per day. Yet, the 5000 mcg products are 150 times more than the AI. Thus, even though the IOM has yet to

set a DRI (daily recommended intake) for biotin, mega-dose amounts are far beyond any conceivable range that would ever be beneficial. As a result, the taking of biotin at these levels is a waste of money, wholly pointless and as discussed below, a health risk.

7.    Biotin is a co-factor for five carboxylase enzymes. A co-factor is a molecule that interacts with an enzyme to facilitate that enzyme's ability to carry out its biochemical functions. Biotin attaches itself to these enzymes, thereby helping each of them perform their respective functions. Taking meg-doses of the substance is not a "more is better" situation. Once, a person obtains a sufficient amount of biotin, which is met by the general population through their everyday diets, any additional amount is functionally superfluous and does not convey any additional health benefit.

8.    In sum, mega-does of biotin do not support healthy hair, skin and nails, because the general population already consumes sufficient, if not additional amounts of biotin from their daily diets.

9.    The only purported scientific support for biotin supplements affecting hair, skin or nails is from studies of people with what is called "frank" deficiency – e.g., those with rare biotin deficiency conditions. These persons experience a variety of symptoms including hair loss along with skin and nail problems. Some studies have shown that in persons with these very rare conditions, biotin supplementation can improve hair/skin/nail health. These study results cannot be extrapolated to the population at large, since almost everyone else is not biotin deficient and, as noted above, already consume sufficient biotin in their daily diets.

10.    Federal law precludes manufacturers of dietary supplements from representing that their dietary supplements treat or cure diseases. The 2000 Institute of Medicine Report from the National Academy of Sciences on *Dietary Reference Intakes for Thiamin, Riboflavin, Niacin, Vitamin B6, Folate, Vitamin B12, Pantothenic Acid, Biotin, and Choline* states that, "No definitive studies demonstrate evidence of biotin deficiency in normal individuals in any group resulting from inadequate intakes." (IOM

Dietary Reference Intakes at 381). The IOM concluded in 2000, and this conclusion remains true today, that while there was a limited amount of information regarding biotin intakes this information indicates that "[T]here is little cause for concern about the adequacy of biotin intake for healthy people…" (*Id.* at 385-86). Accordingly, Defendant's representations do not support the claims that the ingestion of Rite Aid Biotin Products will improve the health of hair, skin and nails.

11.    In addition, there is a hidden danger of Biotin consumption at the levels Rite Aid provides, which Defendant has wholly ignored. Defendant's packages contain no warnings that Biotin use can materially interfere with certain important medical lab tests, which interference may result in serious harm to the user. This issue is so serious that at least one patient has died as a result, and given the now widespread Biotin use, many users are at grave risk that important blood test results may be wholly inaccurate. This skewing of medical tests can show that a person who should test as normal tests as abnormal, and that a person who is really ill may generate blood test results that are "normal". If that test is to determine if a comatose patient brought into the emergency room has had a cardiac incident and the test is skewed to normal when the patient is not normal, that person may die.

12.    Thus, this Complaint addresses a unique situation: Biotin is widely sold as a helpful supplement, yet it may interfere with important blood tests in a way that may threaten the lives of unsuspecting users. Defendant touts its purported benefits, while remaining silent as to its serious detriments.

13.    Defendant should be aware that the FDA has issued a public warning about the risks Biotin may have on the unsuspecting public. So as not to be misleading, Biotin must have a suitable warning on the label so that users know that Biotin may cause serious interference with important blood test results, so potentially serious that the FDA has reported at least one death.

4

14.     As a result of the foregoing, the mega-dose Biotin Products to be taken in daily doses ranging from 1000 mcg to 5,000 mcg as sold by Defendants are unneeded and dangerous and cannot provide any benefit, let alone support healthy hair, skin and nails. Defendant's representations that its Biotin products provide health benefits are false, misleading and reasonably likely to deceive consumers. As a result, consumers,  including Plaintiff and Class Members, have purchased Rite Aid Biotin Products that do not (and cannot) perform as advertised, and which put their health at risk.

15.     Plaintiff brings this action on behalf of himself and other similarly situated consumers who purchased the Rite Aid Biotin Products in New York within the statute of limitations period to obtain redress for those who have purchased these products.   Plaintiff seeks both actual damages and statutory damages, under Section 349 of the New York General Business Law, as well as an award of attorney's fees and expenses.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(d)(2), the Class Action Fairness Act. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and members of the Class are citizens of a state different from that of the Defendant.

17.     This Court has personal jurisdiction over Defendant Rite Aid because Rite Aid has committed misleading, tortious acts within New York State, which have injured New York State consumers, and Rite Aid was aware  or recklessly disregarded its conduct and the harmful effects of its conduct in New York State.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because it is  in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

19.    Plaintiff Daniel Clement ("Plaintiff") is a resident of New Jersey, who purchased Rite Aid Biotin in 2019 from a store in New York City. Plaintiff would not have purchased this product had he known it was both useless and potentially harmful in the ways described in this Complaint. The product had no value to him, so any payment for it constitutes an overpayment, and thus represents an injury in fact. As a result of Defendants' deceptive practices with respect to Rite Aid Biotin Products, Plaintiff Clement has suffered monetary damages.

20.    Defendant Rite Aid Corporation (Rite Aid" or the "Company") is a Delaware corporation with its corporate headquarters at 30 Hunter Lane, Camp Hill, Pennsylvania. Rite Aid distributes, and sells its Biotin Products to tens of thousands of consumers throughout the United States who purchase it in its Rite Aid Drug Stores.

### A.    **FACTUAL ALLEGATIONS**

#### 1.    **The Representations Made on The Biotin Products**

21.    To promote the sale of Biotin, Defendant has consistently conveyed the health benefit message to consumers in New York.

22.    Each consumer who considers the purchase of Biotin Products is presented with the materially deceptive health benefit representations, which appear prominently and conspicuously on the front of each Biotin Product. The front panel of the Biotin Products similar or identical to that purchased by Plaintiff purchased is shown below:



**B.**     **The Impact of Defendant's Materially Deceptive Conduct**

23.     Plaintiff and Class Members have been damaged as a result of their purchases of the Biotin Products and have been deceived into purchasing the Rite Aid Biotin Products which they believed, based on Defendants' representations, would safely provide them health benefits, when, in fact the Biotin Products are useless and create health risks at the dosages at which they are sold.

24.     Defendant sells its Biotin products and does not warn consumers of the very real risk that blood test results may be inaccurate as a result of Biotin use. Thus, Defendant has failed to provide the necessary package warning to consumers so they may avoid potentially serious harm.

25.     In November 2017, the FDA warned that Biotin consumption "can significantly interfere with certain lab tests and cause incorrect test results which may go undetected." As the FDA warning continued:

Biotin in blood or other samples taken from patients who are ingesting high levels of Biotin in dietary supplements **can cause clinically significant incorrect lab test results.** The FDA has seen an increase in the number of reported adverse events, including one death, related to Biotin interference with lab tests. Biotin in patient samples can cause falsely high or falsely low results, depending on the test. Incorrect test results may lead to inappropriate patient management or misdiagnosis. **For example, a falsely low result for troponin, a clinically important biomarker to aid in the diagnosis of heart attacks, may lead to a missed diagnosis and potentially serious clinical implications. The FDA has received a report that one patient taking high levels of Biotin died following falsely low troponin test results when a troponin test known to have Biotin interference was used.** The FDA is aware of people taking high levels of Biotin that would interfere with lab tests. Many dietary supplements promoted for hair, skin, and nail benefits contain Biotin levels up to 650 times the recommended daily intake of Biotin. Physicians may also be recommending high levels of Biotin for patients with certain conditions such as multiple sclerosis (MS). Biotin levels higher than the recommended daily allowance may cause interference with lab tests. **Patients and physicians may be unaware of Biotin interference in laboratory assays.** Even physicians who are aware of this interference are likely unaware as to whether, and how much Biotin, patients are taking. **Since patients are unaware of Biotin interference, patients may not report taking Biotin supplements to their physicians,** and may even be unaware they are taking Biotin (e.g., when taking products generally labeled for their benefits to hair and nails). *(Emphasis added.)*

(The FDA Warning is annexed hereto as **Exhibit A.**)

26.    The FDA's concerns are the culmination of a number of clinical observations by the medical community over a period of time highlighting the risk of injury or death to Biotin users as a result of inaccurate blood test results. These include the following:

a.    In an article appearing in the Endocrine Society January 2016 entitled *Beware of Biotin*, patients' blood tests showed results indicating thyroid disease, including Graves' Disease. The results of the blood tests were corrupted by the patients having taken large Biotin doses. (A copy of this article is annexed hereto as **Exhibit B.**)

b.    Similarly, a release in May 2018, by the College of Family Physicians of Canada has raised the potential for interference with blood tests due to ingestion of large quantities of Biotin. (A copy of this release is annexed hereto as **Exhibit C.**)

c.    In an August 18, 2016, New England Journal of Medicine article entitled *Biotin Treatment Mimicking Graves' Disease*, the author reported that high-dose Biotin use can result in false positive blood tests and mimic Graves' Disease.[4] As it explained:

In search of a unifying explanation for this unusual phenomenon, we conducted a literature search, which revealed that Biotin may interfere with the most commonly used thyrotropin and thyroid hormone assays.5 The results were falsely increased or decreased according to whether a competitive method of measurement (for free T4 and total T3) or noncompetitive method (for thyrotropin) was used. In addition, Biotin also interfered in a competitive manner with the method used for detection of anti–thyrotropin receptor antibodies. *Together, these effects resulted in a laboratory pattern indistinguishable from that of Graves' disease.* (Emphasis added.)

(A copy of this article is annexed hereto as **Exhibit D**.)

d. In a June 6, 2018 article in the Journal of the Endocrine Society it was discussed that a patient was suspected of having a thyroid tumor due to blood test results and related symptoms. After extended study of the patient it was determined that her Biotin use was making the lab tests inaccurate and an otherwise unnecessary surgery was avoided. (A copy of this article is annexed hereto as **Exhibit E**.)

e. In an article entitled *Positive and negative interference in immunoassays following Biotin ingestion: a pharmacokinetic study*, in the October 2013 issue of **Pathology**, it was reported that a newborn baby was treated with Biotin, but the Biotin use caused various blood tests to be inaccurate. (A copy of this article is annexed hereto as **Exhibit F**.)

f. An article published by The Journal of Applied Laboratory Medicine dated December 1, 2016, entitled *Spurious Immunoassay Results Lead to Misdiagnoses* stated that: "This upsurge in Biotin supplementation is having an unintended consequence: spurious immunoassay results in some patients."5 (A copy of this article is annexed hereto as **Exhibit G**.)

g. An article published in Clinical Chemistry on January 17, 2017 entitled *Biotin Interference in Diagnostic Tests* points out the use of large doses of Biotin causes unpredictable results:

Unfortunately, susceptibility to Biotin interference is variable in magnitude and can skew results to be either falsely high or falsely low depending on the assay design and conditions. **The ramifications for patients and caregivers are potentially grave.** In typical competitive immunoassays for small molecules such as free thyroxine (fT4), free triiodothyronine (fT3), testosterone, estradiol, and cortisol. Biotin interference blocks assay signal. Because signal is inversely proportional to analyte concentration in competitive assays, Biotin can cause falsely high results. In the 2-site "sandwich" immunoassay format [typical for larger protein analytes such as thyroid-stimulating hormone (TSH), thyroglobulin, follicle-stimulating hormone (FSH), luteinizing hormone (LH), insulin, and for autoantibodies], excess Biotin competes with the Biotinylated complex causing a reduction in signal and a falsely lower result. This combination of 2 types of Biotin interference can create the perfect factitious biochemical evidence of Graves thyrotoxicosis with highly increased fT4 and fT3, positive TSH receptor antibodies and suppressed TSH. Similar scenarios of Biotin interference can be imagined for extremely high steroid hormone

concentrations with suppressed LH or FSH, which would be suggestive of tumors.

A broad range of laboratory tests beyond endocrine assays may be impacted similarly by Biotin-induced interference, which can give rise to either very confusing results or very compelling factitious results. Extreme laboratory test values as well as clinically discordant ones may be easily recognized as interferences, but subtle or moderate Biotin-induced changes in results would not be identifiable by the laboratory. *Even a slight skewing of results can pose serious ramifications for tests in which misdiagnosis of serious infectious diseases such as HIV or hepatitis C virus or failure to recognize a tumor recurrence may occur. Emergency room patients may be at risk if Biotin interferes with the assays for cardiac markers.* Patients on thyroid medication may be titrated improperly owing to inaccurate but clinically congruous laboratory results. And the list goes on, and clinicians who recognize these problems will be looking to laboratorians for guidance. (Emphasis added.)

(A copy of this article is annexed hereto as **Exhibit H**.)

27.    Thus, a male patient's PSA test could result in a false low positive when in fact his true results would have been a marker for active prostate cancer. Yet Defendant provides no warning to its unsuspecting customers that such results might occur. A patient in the emergency room is given blood tests to determine if she has had a heart attack. However, due to Biotin interference, the test comes back negative, when in fact it should have signaled that a heart event had occurred, and the patient later dies.

28.    On November 4, 2019, the FDA reiterated its strong warnings concerning Biotin:

Biotin in blood or other samples taken from patients who are ingesting high levels of biotin in dietary supplements can cause clinically significant incorrect lab test results. The FDA has seen an increase in the number of reported adverse events, including one death, related to biotin interference with lab tests.

Biotin in patient samples can cause falsely high or falsely low results, depending on the test. Incorrect test results may lead to inappropriate patient management or misdiagnosis. For example, a falsely low result for troponin, a clinically important biomarker to aid in the diagnosis of heart attacks, may lead to a missed diagnosis and potentially serious clinical implications. The FDA has received a report that one patient taking high levels of biotin died following falsely low troponin test results when a troponin test known to have biotin interference was used.

The FDA is aware of people taking high levels of biotin that would interfere with lab tests. Many dietary supplements promoted for hair, skin, and nail benefits contain biotin levels up to 650 times the recommended daily intake of biotin. Physicians may also be recommending high levels of biotin for patients with certain conditions such as multiple sclerosis (MS). Biotin levels higher than the recommended daily allowance may cause interference with lab tests.

Patients and physicians may be unaware of biotin interference in laboratory assays. Even physicians who are aware of this interference are likely unaware as to whether, and how much biotin, patients are taking. Since patients are unaware of biotin interference, patients may not report taking biotin supplements to their physicians, and may even be unaware they are taking biotin (e.g., when taking products generally labeled for their benefits to hair and nails).

(A copy of the FDA Warning is annexed hereto as **Exhibit I.**)

29.    Thus, Biotin exposes users to a unique and serious health risk heightened by the lack of suitable warnings on Defendant's Biotin labelling that puts consumers' health at risk by undermining the effectiveness of blood testing protocols--one of the bedrocks of medical diagnosis.

30.    Even if Rite Aid sought to market Biotin supplements to that miniscule portion of the public that has a Biotin deficiency, the doses needed would be tiny, and not anything near the mega-doses Rite Aid sells which creates interference with lab results.

31.    Members of the public have been and will be deceived and injured if the products continue to be marketed without appropriate warnings which could save their lives.  Consumers are presented only with possible benefits, yet no risks are revealed.  Having spoken, Rite Aid must speak the full truth.

## CLASS ALLEGATIONS

32.    Plaintiff brings this action on behalf of himself and all other similarly situated consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

All New York consumers who, within the applicable statute of limitations period until the date class notice is disseminated, purchased Rite Aid Biotin Products. Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased Biotin Products for the purpose of resale.

33.    **Numerosity.** The Class Members are so numerous that joinder of all Members is impracticable. Plaintiff is informed and believes that the proposed Class contains thousands of purchasers of Rite Aid Biotin Products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff but may be sufficiently determined through discovery of sales records.

34.    **Common Questions of Law and Fact Predominate.**    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether Defendant's health benefit representations discussed above are misleading, or objectively reasonably likely to deceive;

b.    whether Defendant's health risk omissions are misleading, or objectively reasonably likely to deceive;

c.    whether Defendant's alleged conduct is unlawful;

d.    .whether the alleged conduct constitutes violations of the laws asserted;

d.    whether Plaintiff and Class members are entitled to appropriate remedies, including actual and statutory damages.

35.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Classes because, *inter alia*, all Class Members were injured through the uniform misconduct

12

described above and were subject to Defendant's deceptive health benefit representations and health risk omissions on each and every Biotin Product container. Plaintiff's claims and legal theories on behalf of himself are the same as all Class Members.

36.    **Adequacy of Representation.**    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff will vigorously prosecute this action. Plaintiff has no adverse or antagonistic interests to those of the Classes.

37.    **Superiority.**    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## CLAIMS ALLEGED

### COUNT I

### Violation of Section 349 of the General Business Law

38.     Plaintiff realleges and incorporates by reference all previous allegations of the Complaint as if they were set forth in full herein.

39.     Defendant sells Rite Aid Biotin Products in New York to consumers based on false representations that they have health benefits. The medical literature provides no scientific support for these claims. Rather, the medical consensus is that mega-doses of Rite Aid Biotin Products provide no human benefit.

40.     Defendant's Biotin Products earn it substantial revenue but provide no benefit at all to consumers. Moreover, the Biotin Products are dangerous. Defendant has failed to warn that use of Biotin Products may result in serious health risk or death because Biotin interferences with important laboratory tests. The failure to disclose constitutes a violation of law.

41.     It is also a violation of law to sell Biotin in amounts which could have no bearing on any of the health benefit representations, in that no one could benefit from the levels of the supplement sold. Thus, the sale of Biotin by Defendant in mega-doses was a scam to mark up the price of Biotin, irrespective of whether it could meet the health benefit representations or not.

42.     The false representations and the deceit is uniform throughout New York.

43.     Consumers who have purchased Rite Aid Biotin Products obtain no benefit from them, but the Defendant enriches itself selling what is in essence dangerous "snake oil".

44.     As a result of this violation, Plaintiff and the Class Members have been damaged.

45.     Where a defendant, as here, deceives a class of purchasers by uniform omissions, causation of damages to the class of purchasers is legally presumed.

46.     Plaintiff and the Class are entitled to compensatory damages, treble damages and class wide statutory penalty damages. *See Rodriguez v. It's Just Lunch Int'l,* No. 07-cv-9227 (SHS), 2018 U.S. Dist. LEXIS 131870, at *23-24 (S.D.N.Y. Aug. 6, 2018).

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff prays for a judgment:

A.     Certifying the Class as requested herein;

B.     Awarding actual and statutory damages, to Plaintiff and the Class Members as appropriate;

C.     Awarding attorneys' fees and costs; and

D.     Providing such further relief as may be just and proper.

Dated: August 21, 2020

**ROY JACOBS & ASSOCIATES**

By: _____

Roy L. Jacobs

420 Lexington Avenue
Suite 2440
New York, NY 10170
212-867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com

*Attorneys for Plaintiff*

**Of Counsel:**

15

Laurence D. Paskowitz
**PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380
New York, NY 10022
Tel: 212-685-0969
lpaskowitz@pasklaw.com

# EXHIBIT A

# EXHIBIT A

# The FDA Warns that Biotin May Interfere with Lab Tests: FDA Safety Communication

Date Issued: November 28, 2017

## Audiences:

- People taking or considering taking biotin, vitamin B7, supplements
- Physicians and other health care providers who order lab tests
- Lab personnel
- Lab test developers

## Specialties:

All physicians and health care providers

## Product:

Many lab tests use biotin technology due to its ability to bond with specific proteins which can be measured to detect certain health conditions. For example, biotin is used in hormone tests and tests for markers of cardiac health like troponin. Biotin, also known as vitamin B7, is a water-soluble vitamin often found in multi-vitamins, prenatal vitamins, and dietary supplements marketed for hair, skin, and nail growth.

## Purpose:

The FDA is alerting the public, health care providers, lab personnel, and lab test developers that biotin can significantly interfere with certain lab tests and cause incorrect test results which may go undetected.

# Summary of Problem and Scope:

Biotin in blood or other samples taken from patients who are ingesting high levels of biotin in dietary supplements can cause clinically significant incorrect lab test results. The FDA has seen an increase in the number of reported adverse events, including one death, related to biotin interference with lab tests.

Biotin in patient samples can cause falsely high or falsely low results, depending on the test. Incorrect test results may lead to inappropriate patient management or misdiagnosis. For example, a falsely low result for troponin, a clinically important biomarker to aid in the diagnosis of heart attacks, may lead to a missed diagnosis and potentially serious clinical implications. The FDA has received a report that one patient taking high levels of biotin died following falsely low troponin test results when a troponin test known to have biotin interference was used.

The FDA is aware of people taking high levels of biotin that would interfere with lab tests. Many dietary supplements promoted for hair, skin, and nail benefits contain biotin levels up to 650 times the recommended daily intake of biotin. Physicians may also be recommending high levels of biotin for patients with certain conditions such as multiple sclerosis (MS). Biotin levels higher than the recommended daily allowance may cause interference with lab tests.

Patients and physicians may be unaware of biotin interference in laboratory assays. Even physicians who are aware of this interference are likely unaware as to whether, and how much biotin, patients are taking. Since patients are unaware of biotin interference, patients may not report taking biotin supplements to their physicians, and may even be unaware they are taking biotin (e.g., when taking products generally labeled for their benefits to hair and nails).

# Recommendations:

## For Consumers:

- Talk to your doctor if you are currently taking biotin or are considering adding biotin, or a supplement containing biotin, to your diet.

- Know that biotin is found in multivitamins, including prenatal multivitamins, biotin supplements, and supplements for hair, skin, and nail growth in levels that may interfere with laboratory tests.

- Be aware that some supplements, particularly those labeled for hair, skin, and nail benefits, may have high levels of biotin, which may not be clear from the name of the supplement.

- If you have had a lab test done and are concerned about the results, talk to your health care provider about the possibility of biotin interference.

## For Health Care Providers:

- Talk to your patients about any biotin supplements they may be taking, including supplements marketed for hair, skin, and nail growth.

- Be aware that many lab tests, including but not limited to cardiovascular diagnostic tests and hormone tests, that use biotin technology are potentially affected, and incorrect test results may be generated if there is biotin in the patient's specimen.
- Communicate to the lab conducting the testing if your patient is taking biotin.
- If a lab test result doesn't match the clinical presentation of your patient, consider biotin interference as a possible source of error.
- Know that biotin is found in multivitamins, including prenatal multivitamins, biotin supplements, and dietary supplements for hair, skin, and nail growth in levels that may interfere with lab tests.
- Report to the lab test manufacturer and the FDA if you become aware of a patient experiencing an adverse event following potentially incorrect laboratory test results due to biotin interference.

## For lab personnel:

- If you use assays with biotin technology, be aware that it is difficult to identify samples that contain biotin; therefore, it is important to communicate with health care providers and patients to prevent incorrect test results.
- If you are collecting samples in the lab, ask whether the patient is taking biotin.
- Educate health care providers about biotin interference with certain lab tests used in your lab.
- Consider that the daily recommended allowance for biotin is 0.03 mg and these biotin levels do not typically cause significant interference. However, supplements containing high biotin levels including those marketed for hair, skin, and nail benefits, may contain up to 20 mg of biotin, and physicians may recommend up to 300 mg per day for conditions such as multiple sclerosis. Biotin levels higher than the recommended daily allowance may cause significant interference with affected lab tests.
- Be aware that specimens collected from patients taking high levels of biotin may contain more than 100 ng/mL biotin. Concentrations of biotin up to 1200 ng/mL may be present in specimens collected from patients taking up to 300 mg per day.
- Currently available data is insufficient to support recommendations for safe testing using affected tests in patients taking high levels of biotin, including about the length of time for biotin clearance from the blood.
- Communicate with the lab test manufacturer if you have questions about biotin interference.

## For lab test manufacturers and developers:

- If your assay uses biotin technology, contact the FDA to discuss biotin interference.
- Investigate interference from biotin (up to at least 1200 ng/mL biotin) in your assays that use biotin technology. Determine the lowest concentration of biotin that may cause clinically significant interference with your test(s).
- Communicate with your customers if they may be unaware that your test uses biotin technology and how it may be affected.

- Contact the FDA if you have any questions about biotin technology and interference.

## FDA Actions:

The FDA is working with stakeholders to better understand biotin interference with laboratory tests, and to develop additional future recommendations for safe testing in patients who have taken high levels of biotin when using laboratory tests that use biotin technology.

The FDA is monitoring reports of adverse events associated with biotin interference with laboratory tests and will update the public if significant new information becomes available.

## Reporting Problems to the FDA:

Prompt reporting of adverse events can help the FDA identify and better understand the risks associated with these products.

If you suspect or experience a problem with a laboratory test while taking biotin, we encourage you to file a voluntary report through **MedWatch (/Safety/MedWatch/default.htm)**, the FDA Safety Information and Adverse Event Reporting program. Health care personnel employed by facilities that are subject to FDA's user facility reporting requirements should follow the reporting procedures established by their facilities.

## Additional Resources

- **NIH Biotin Fact Sheet for Consumers (https://ods.od.nih.gov/factsheets/Biotin-Consumer/)**

## Contact Information:

If you have questions about this communication, please contact CDRH's Division of Industry Communication and Education (DICE) at **DICE@FDA.HHS.GOV (mailto:DICE@FDA.HHS.GOV)**, 800-638-2041, or 301-796-7100.

**More in Safety Communications (/MedicalDevices/Safety/AlertsandNotices/default.htm)**

**2019 Safety Communications (/MedicalDevices/Safety/AlertsandNotices/ucm630141.htm)**

**2018 Safety Communications (/MedicalDevices/Safety/AlertsandNotices/ucm592582.htm)**

3/26/2019

Safety Communications > The FDA Warns that Biotin May Interfere with Lab Tests: FDA Safety Communication

**2017 Safety Communications (/MedicalDevices/Safety/AlertsandNotices/ucm553873.htm)**

# EXHIBIT B

# EXHIBIT B

# Endocrine
## news



THYROID NEWS AND RESEARCH ARTICLES

# January 2016: Thyroid Month: Beware of Biotin

**BY ERIC SEABORG | JAN 2016**

*More patients are taking the dietary supplement biotin, which could be throwing off a number of test results from thyroid cancer to Graves' disease.*

The thyroid test results made no sense, so the patient's primary care physician sought help from an endocrinologist. The physician had been treating the patient's hypothyroidism successfully with levothyroxine for some time, when suddenly her free T4 levels spiked despite a normal thyroid stimulating hormone (TSH) level.

The physician referred the patient to Cary N. Mariash, MD, professor of clinical medicine at Indiana University in Indianapolis, where additional laboratory tests had inconsistent results: her free T4 and total T3 were elevated, but her total T4, T4 index, and TSH were normal.

Fortunately, Mariash could clear up the confusion by asking the patient a simple question: "Are you taking biotin?"

Yes, she replied, she had recently started taking 10 mg a day in hopes of improving her hair and nails. Her tests returned to normal when she stopped taking biotin. The problem had nothing to do with the patient's thyroid — the biotin was interfering with the tests.

Mariash presented this case at the recent International Thyroid Congress because he has recently encountered several patients whose abnormal thyroid test results were caused by taking biotin and "most endocrinologists don't know about this problem."

Carol Greenlee, MD, an endocrinologist practicing in Grand Junction, Colo., concurs that she is encountering an increasing number of confounding lab results caused by patients taking large doses of biotin.

> **"I saw somebody just yesterday who has had an extensive workup for hyperthyroidism. A lot of her tests look like she has Graves, but she is taking massive doses of biotin. She probably doesn't have any thyroid problem. We could be treating people for Graves' disease who don't have it, and that's really scary." — Carol Greenlee, MD, endocrinologist, Grand Junction, Colo.**

"I saw somebody just yesterday who has had an extensive workup for hyperthyroidism. A lot of her tests look like she has Graves', but she is taking massive doses of biotin. She probably doesn't have any thyroid problem. We could be treating people for Graves' disease who don't have it, and that's really scary," Greenlee says.

### An Unregulated Supplement

Many people have begun taking biotin mainly in the belief that it is a key contributor to keratin, and therefore can improve hair, nails, and skin. It is marketed under a number of names, including vitamin B7, vitamin H, and coenzyme R, and sometimes may be listed only as an unnamed supplement to improve hair and nails.

It is a B vitamin, and the Institute of Medicine recommends a daily intake of 30 mcg. That's what a multivitamin such as Centrum Silver contains. But some patients, like the one Mariash treated, are taking milligram amounts, and might not consider it a medication, so not worth mentioning. It is marketed over the Internet, and Mariash recently saw a television advertisement for it, so its popularity could continue to grow.

### An Issue with Assays

The problem is that almost all immunoassays today contain biotin because they rely on the biotin–streptavidin attraction to either anchor the assay's antibodies to a capture surface or capture them once they have reacted with a patient sample, according to Stefan K. Grebe, MD, PhD, professor of laboratory medicine & pathology and co-director of the endocrine laboratory at the Mayo Clinic in Rochester, Minn.

### Biotin At A Glance

- Many patients are taking megadoses of biotin that can cause falsely high and falsely low results in a variety of laboratory tests, including thyroid tests.
- Patients are taking these supplements mainly to improve their hair, skin, and nails — and might not consider them medications to report on their list.
- Biotin interference with lab tests could be causing misdiagnoses — and even mistreatment — in an unknown number of patients. [/pullout-wide]

Large amounts of biotin in a patient sample can interfere with this process. However, the effects can be confusing because, depending on the particular assay, biotin can skew the results to be either falsely high or falsely low. In the case of competitive immunoassays — usually used for low molecular weight targets (such as T4, T3, and cortisol) — biotin interference causes a falsely high result. In immunometric (sandwich) assays, it gives a falsely low result.

Other characteristics of the assay can also make a difference. For instance, a longer incubation time increases the opportunity for interference. Different assays for various analytes, even from the same manufacturer, can therefore vary in their susceptibility to biotin interference.

At the laboratory Mariash uses, the free T4 and total T3 assays use a biotin-streptavidin fluorescent detection system, so biotin can cause falsely elevated results, but the TSH and total T4 assays are not affected. In contrast, at Greenlee's lab, biotin can lead to falsely low TSH results, but free T3 and free T4 tests are not affected. Biotin can also cause her lab's assay for thyrotropin receptor antibodies (TRAb) to be falsely positive, which could lead to a misdiagnosis of Graves disease.

Mariash says that even though he suspected what was causing the questionable results, getting to the bottom of the problem was not easy: "I had to make a lot of phone calls to our laboratory. Finally a supervisor told me what platform they were using. Then I called the test manufacturer to get additional details, and they gave me enough information to know what was going on. But of course, they don't give you every detail because some of it is proprietary." Mariash's laboratory director was unaware that biotin could be a problem.

Grebe says it may fall to the physician ordering the test to be vigilant: "When your lab results don't make sense in terms of the clinical picture, or in terms of the constellation of lab results you have received, you should always think first of an assay interference — one of which is biotin — before you think of really exotic reasons for this to have happened, such as TSH-secreting pituitary tumors."

## Puzzling Tests and a Revelation

Greenlee had an example of these confusing results when a patient was referred to be evaluated for a possible diagnosis of adrenal carcinoma. The patient had presented complaining of fluid retention and weight gain. Her face was red and she was growing hair on her face while losing hair on top of her head.

Her cortisol and testosterone test results were elevated off the charts. Her thyroid tests were also confusing, with low TSH but normal T4 and T3.

> **"When your lab results don't make sense in terms of the clinical picture, or in terms of the constellation of lab results you have received, you should always think first of an assay interference — one of which is biotin — before you think of really exotic reasons for this to have happened, such as TSH-secreting pituitary tumors." — Stefan K. Grebe, MD, PhD, professor, laboratory medicine & pathology; co-director, endocrine laboratory, Mayo Clinic in Rochester, Minn.**

A normal adrenal CT scan ruled out cancer. Greenlee asked the woman to come back the next morning for fasting blood tests. This time her tests were normal. Greenlee thought that perhaps there was some mix-up at the lab, and the original tests were not this patient's.

The solution to the mystery only emerged over time. The patient's problems stemmed from her home remedies for her hair loss — minoxidil and biotin. Not knowing her hair loss was not unusual for an older woman, and despite warnings that it should not be used by women, she was putting minoxidil on the top of her head — resulting in a red, hairy face.

The final piece of the puzzle fell into place when Greenlee was preparing a talk and came across a reference to biotin interfering with a parathyroid hormone assay. Her research following up this clue led her to literature reports of other biotin interferences. In the case of this patient, because she had been told to fast before she was tested again, she had not taken biotin, so those results reflected her true status. The biotin interference contributed to her out-of-kilter cortisol, testosterone, and TSH results. In unraveling the mystery, Greenlee consulted with Grebe to learn more about the ins and outs of immunoassays and worked closely with her lab — making them aware of the potential interference.

### Biotin Vigilance

Greenlee is now making sure her practice identifies any patients taking the supplement: "We have huge signs in my office that ask people if they are taking biotin — in each exam room, over the phlebotomy chair, and at the front desk. We had all these nice pictures on our walls, but the biotin thing alarmed us so much that we don't care about our decorations in our office anymore."

"It can be dangerous not to recognize it," Mariash agrees. He also notes that clinicians need to be vigilant because laboratories can change the test platform without notice.

For the interference to occur, the patient's biotin level needs to be high — at least three times the upper limit of the healthy adult reference range, according to Grebe. But that level is easy to achieve with the megadoses many are taking.

Grebe suggests that a clinician can ask the lab to try using another manufacturer's test, but an easier route is to ask the patient to stop the biotin then get retested. Biotin is water soluble, so it washes out of the body quickly — even a single day can make a big difference in the test results.

And although literature reports mostly focus on problems with parathyroid and thyroid hormone tests, biotin interference could be considered as a potential contributor to almost any suspicious immunoassay result.

Published by the Endocrine Society, Endocrine News is a monthly publication that offers an in-depth look at endocrinology trends and research, from reproductive issues to biotin concerns to thyroid problems. When you're looking for the latest studies, interviews and commentary on endocrinology, you can find it on our site. With that in mind, if you're interested in reading additional content with timely, accurate information on thyroid issues, check out our other articles such as "<u>Fairytales: Dispelling Pediatric Thyroid Cancer Myths</u>" and "<u>Thyroid Cancer and Radioiodine</u>."

***Seaborg is a freelance writer based in Charlottesville, Va. He wrote about expanding the definition of osteoporosis in the December issue.***



© 2015 Copyright Endocrine Society. All rights reserved.2055 L Street NW, Suite 600 | Washington, DC 20036
Phone: 202.971.3636 | Toll-free: 888.363.6274

Website Design and Development by **Matrix Group International**

# EXHIBIT C

# EXHIBIT C

CFP·MFC
CANADIAN FAMILY PHYSICIAN · LE MÉDECIN DE FAMILLE CANADIEN

Official Publication of
The College of
Family Physicians of Canada

Can Fam Physician. 2018 May; 64(5): 370.

PMCID: PMC5951654
PMID: 29760259

# Biotin interference

## Underrecognized patient safety risk in laboratory testing

Jessica L. Gifford, PhD

Clinical biochemistry fellow in the Clinical Biochemistry Section for Calgary Laboratory Services and in the Department of Pathology and Laboratory Medicine at the University of Calgary in Alberta.

S.M. Hossein Sadrzadeh, PhD DABCC FACB

Chief of the Clinical Biochemistry Section for Calgary Laboratory Services and Clinical Professor in the Department of Pathology and Laboratory Medicine at the University of Calgary.

Christopher Naugler, MD MSc FCFP FRCPC

Associate Professor and Head of the Department of Pathology and Laboratory Medicine at the University of Calgary and Calgary Laboratory Services.

Copyright © the College of Family Physicians of Canada

Dietary supplementation with biotin is increasingly recognized as a patient safety risk, as it might lead to incorrect results for various common laboratory tests. Biotin (also known as *vitamin H, vitamin B7,* and *coenzyme R*) is a water-soluble vitamin that acts as an enzyme cofactor in fatty acid biosynthesis, the citric acid cycle, and metabolism of odd-numbered fatty acids and branched-chain amino acids. It has additional roles in gluconeogenesis and gene expression. In the diet, biotin is bound to proteins found in organ meats, such as liver, kidney, and pancreas, as well as in eggs, yeast, and milk. Cereal grains, fruits, most vegetables, and muscle meat are poor sources of biotin. In Western populations, dietary biotin intake is estimated to be 35 to 70 μg daily, a level in line with the recommended dietary allowance. Most multivitamin pills contain about 30 μg of biotin. High-dose supplementation (doses greater than 1 mg/d) plays a role in therapy for several diseases, including biotinidase deficiency, mitochondrial metabolic disorders, and multiple sclerosis.[1] Doses up to 10 mg a day are frequently encountered in nutritional supplements taken to improve hair, skin, and nail health.

The problem is that many common blood tests employ a biotin-streptavidin reaction as part of the test procedure. While the amount of usual dietary biotin intake is not expected to be high enough to affect these tests, biotin supplementation at doses greater than 1 mg per day can cause either falsely low or falsely high test results, depending on the analyte and platform used for testing.

Biotin interference is particularly dangerous for patients in emergency situations who do not know they are taking high doses of biotin or when the treating physician does not know the patient is taking high doses. A literature search revealed an increasing number of published cases, most describing the problem of biotin interference in thyroid function tests.[2] High-dose biotin can produce a dangerous combination of positive and negative interference among the thyroid tests (free thyroxine, free triiodothyronine, thyroid-stimulating hormone, and thyroid-stimulating hormone receptor antibodies) and paint a picture of Graves disease in patients who have either no clinical symptoms or unrelated symptoms. Without good clinical observations, this

could lead to unnecessary procedures and treatments. Interference of high-dose biotin with thyroid tests is particularly troubling for patients with multiple sclerosis, as large doses of this vitamin are emerging as a new treatment.[2] Interference with parathyroid hormone, follicle-stimulating hormone, luteinizing hormone, sex-hormone binding globulin, estradiol, progesterone, testosterone, cortisol, folate, vitamin B12, and ferritin testing has also been reported.[2]

The list of affected immunoassays varies for each analytic platform, and for a given test the manufacturer-supplied product information must be consulted to determine if biotin is an interferent. For some platforms, the list is extensive and includes the aforementioned tests, as well as those for cardiac function, β–human chorionic gonadotropin, and cancer biomarkers.[4] In many of these immunoassays, biotin was an established interferent, but at doses thought to be rarely encountered in the general population. While manufacturers are aware of the increasing use of high-dose biotin and its potential effects on patient care, they have not, to date, suggested any concrete solutions beyond having patients abstain from this vitamin. Solutions proposed by local clinical laboratories include diluting the specimen with a validated assay diluent, running specimens on a different platform known to be unaffected by biotin, and using streptavidin-agarose beads to remove the biotin before the sample is run on the affected analyzer.[5] All of these solutions will increase the costs associated with testing and highlight the potential financial implications of high-dose biotin on the health care system.

Interference of high-dose biotin on immunoassays in the clinical laboratory is an emerging issue. Many questions have not been addressed. What is the prevalence of high-dose biotin in a given patient population? What are the pharmacokinetics of high-dose biotin? How effective is the use of streptavidin-agarose beads to remove biotin interference? For many laboratories, the current solution is basic: It is recommended that patients abstain from taking biotin for at least 48 hours before specimen collection. The most effective approach, however, is an extensive communication campaign to educate physicians and patients.

## Footnotes

**Competing interests**

None declared

This article has been peer reviewed.

## References

1. Tourbah A, Lebrun-Frenay C, Edan G, Clanet M, Papeix C, Vukusic S, et al. MD1003 (high-dose biotin) for the treatment of progressive multiple sclerosis: a randomised, double-blind, placebo-controlled study. Mult Scler. 2016;22(13):1719–31. Epub 2016 Sep 1. [PMC free article] [PubMed] [Google Scholar]

2. Elston MS, Sehgal S, Du Toit S, Yarndley T, Conaglen JV. Factitious Graves' disease due to biotin immunoassay interference—a case and review of the literature. J Clin Endocrinol Metab. 2016;101(9):3251–5. [PubMed] [Google Scholar]

3. Siddiqui U, Egnor E, Sloane JA. Biotin supplementation in MS clinically valuable but can alter multiple blood test results. Mult Scler. 2017;23(4):619–20. Epub 2016 Dec 7. [PubMed] [Google Scholar]

4. Piketty ML, Polak M, Flechtner I, Gonzales-Briceño L, Souberbielle JC. False biochemical diagnosis of hyperthyroidism in streptavidin-biotin-based immunoassays: the problem of biotin intake and related interferences. Clin Chem Lab Med. 2017;55(6):780–8. [PubMed] [Google Scholar]

5. Piketty ML, Prie D, Sedel F, Bernard D, Hercend C, Chanson, et al. High-dose biotin therapy leading to false biochemical endocrine profiles: validation of a simple method to overcome biotin interference. Clin Chem Lab Med. 2017;55(6):817–25. [PubMed] [Google Scholar]

Articles from Canadian Family Physician are provided here courtesy of **College of Family Physicians of Canada**

# EXHIBIT D

# EXHIBIT D

No potential conflict of interest relevant to this letter was reported.

1. Food and Drug Administration. Observation of an increased incidence of fractures in female patients who received long-term treatment with ACTOS (pioglitazone HCl) tablets for type 2 diabetes. Deerfield, IL: Takeda Pharmaceuticals, March 2007 (http://www.fda.gov/downloads/Safety/MedWatch/SafetyInformation/SafetyAlertsforHumanMedicalProducts/UCM153896.pdf).
2. Loke YK, Singh S, Furberg CD. Long-term use of thiazolidinediones and fractures in type 2 diabetes: a meta-analysis. CMAJ 2009;180:32-9.
3. Bone HG, Lindsay R, McClung MR, Perez AT, Raanan MG, Spanheimer RG. Effects of pioglitazone on bone in postmenopausal women with impaired fasting glucose or impaired glucose tolerance: a randomized, double-blind, placebo-controlled study. J Clin Endocrinol Metab 2013;98:4691-701.
4. Black DM, Rosen CJ. Postmenopausal osteoporosis. N Engl J Med 2016;374:254-62.

DOI: 10.1056/NEJMc1605904

**THE AUTHORS REPLY:** We agree with the observation by Bursztyn that the effectiveness of pioglitazone in reducing cardiovascular events in the IRIS trial may be partially attributable to blood-pressure reduction. However, the difference in systolic blood pressure between the study groups (about 2 mm Hg at 1 year) is probably not large enough to explain the substantial reduction in the relative risk of stroke and myocardial infarction (24%). As in most clinical trials, our trial was not designed to define the mechanism of action of the tested agent.

Doehner and Anker posit that pioglitazone-associated weight gain, rather than being an adverse effect, may have been protective in participants who received the drug. It is true that pioglitazone resulted in weight gain in our trial, but it also reduced insulin resistance and lowered the risk of vascular events. The relationship among thiazolidinedione-induced weight gain, redistribution of fat from visceral to subcutaneous sites, and improved insulin sensitivity has been recognized for years. However, our results should not be interpreted to indicate that overweight or weight gain per se are beneficial after stroke.

Overweight and obesity are associated with an increased risk of vascular disease, and weight loss is effective in increasing insulin sensitivity and reducing dyslipidemia and several mediators of vascular risk. The research cited by Doehner and Anker showing that obese patients who have a stroke or TIA have longer survival than normal-weight patients may have been affected by selection bias.[1] In labeling weight gain as an adverse effect in this double-blind trial, we recognized its potentially unfavorable effects with respect to the risk of nonvascular events among all participants, its unfavorable effects on vascular risk among some participants (e.g., placebo recipients), and the potential for it to compromise patient comfort and acceptance of blinded therapy.[2]

Finally, Hu et al. ask whether the overall risk increment for serious bone fracture of 2 per 100 patients may underrepresent the potential for harm of pioglitazone in women, who were a minority of IRIS participants. We recognize the importance of an accurate accounting and weighing of risks and benefits of pioglitazone for individual patients and groups of patients. A detailed analysis of fracture risk among patients in our trial is under way. In response to the specific concern raised by the correspondents, we can confirm that the absolute and relative risk increment for any serious fracture observed in women was actually less than that in men.

Catherine M. Viscoli, Ph.D.
Walter N. Kernan, M.D.
Lawrence H. Young, M.D.
Yale School of Medicine
New Haven, CT
walter.kernan@yale.edu

Dr. Viscoli reports receiving consulting fees from Takeda Pharmaceuticals International for analyzing data on prostate cancer in the IRIS trial. Since publication of their article, Drs. Kernan and Young report no further potential conflict of interest.

1. Lajous M, Banack HR, Kaufman JS, Hernán MA. Should patients with chronic disease be told to gain weight? The obesity paradox and selection bias. Am J Med 2015;128:334-6.
2. Kushner RF, Sujak M. Prevention of weight gain in adult patients with type 2 diabetes treated with pioglitazone. Obesity (Silver Spring) 2009;17:1017-22.

DOI: 10.1056/NEJMc1605904

# Biotin Treatment Mimicking Graves' Disease

**TO THE EDITOR:** Biotin is a water-soluble vitamin that is widely used in over-the-counter dietary supplements.[1] Apart from its administration in nutritional deficiency or nonmedical applications, biotin plays an important role in the therapy of several inherited metabolic diseases (e.g., biotin–

The New England Journal of Medicine
Downloaded from nejm.org by Roy Jacobs on June 21, 2019. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

**Table 1. Characteristics of Six Children with Biotin-Induced Laboratory Indications of Autoimmune Hyperthyroidism.***

| Variable | Patient 1 | Patient 2 | Patient 3 | Patient 4 | Patient 5 | Patient 6 |
|---|---|---|---|---|---|---|
| Sex | Female | Female | Male | Male | Male | Male |
| Age | 9 yr | 2 yr | 2 yr | 5 mo | 1 mo | 1 mo |
| Primary disease | BTBGD | BTBGD | BTBGD | Infantile mitochondrial disease | Neonatal mitochondrial disease | Neonatal mitochondrial disease |
| Biotin dose (mg/kg/day) | 10 | 14 | 15 | 2 | 7 | 8 |
| Concomitant medication | Thiamine | Thiamine, methimazole, cholecalciferol, levetiracetam, chloral hydrate | Thiamine, methimazole, oxcarbazepine | Thiamine, sodium phenylbutyrate, propranolol, nystatin, cholecalciferol | CoQ10, thiamine, cholecalciferol, carnitine, riboflavin, bisoprolol, aspirin, furosemide | CoQ10, thiamine, methimazole, cholecalciferol, carnitine, riboflavin |
| **Laboratory results** | | | | | | |
| During biotin treatment | | | | | | |
| Thyrotropin (μIU/ml) | 0.05 | 0.02 | 0.04 | 0.02 | 0.08 | 0.03 |
| Free T$_4$ (ng/dl) | 6.24 | >7.77 | >7.77 | >7.77 | >7.77 | >7.77 |
| Anti-thyrotropin receptor antibodies (IU/liter) | 38.6 | >40.0 | >40.0 | >40.0 | >40.0 | >40.0 |
| Total T$_3$ (ng/dl) | >6.5 | ND | >6.5 | >6.5 | >6.5 | ND |
| 1–7 Days after discontinuation of biotin | | | | | | |
| Thyrotropin (μIU/ml) | 1.80 | 3.75 | 6.07 | 2.20 | 8.12 | 2.87 |
| Free T$_4$ (ng/dl) | 1.58 | 1.70 | 1.16 | 1.13 | 1.84 | 1.91 |
| Anti-thyrotropin receptor antibodies (IU/liter) | <0.3 | ND | 0.7 | 1.0 | 0.4 | <0.3 |
| Total T$_3$ (ng/dl) | 2.0 | ND | 1.8 | ND | 1.8 | 2.3 |
| Antithyroid medication | No | Methimazole treatment for 14 mo with up to 1.9 mg/kg/day† | Methimazole treatment for 3.5 mo with up to 0.9 mg/kg/day‡ | No | No | Methimazole treatment for 2 wk |

* Serum biotin levels were highly elevated in all children during therapy (>3000 ng per liter). Levels of free thyroxine (T$_4$), total triiodothyronine (T$_3$), and thyrotropin were normalized within 24 to 48 hours after the discontinuation of biotin in all patients, whereas normalization of levels of anti–thyrotropin receptor antibodies took up to several days in some patients. Normal ranges are as follows: thyrotropin, 0.85 to 6.46 μIU per milliliter; free T$_4$, 0.94 to 1.71 ng per deciliter; anti–thyrotropin receptor antibodies, less than 1.7 IU per liter; and total T$_3$, 0.8 to 2.6 ng per deciliter. BTBGD denotes biotin–thiamine–responsive basal ganglia disease, CoQ10 coenzyme Q10, and ND not determined.
† After the discontinuation of biotin, mild hypothyroidism became evident, with spontaneous recovery after the discontinuation of methimazole. Possible long-term complications due to transient hypothyroidism are unclear in this patient.
‡ Methimazole treatment intermittently normalized laboratory values during biotin treatment. After the discontinuation of biotin and methimazole, all values normalized completely. There was no evidence of long-term complications due to transient hypothyroidism.

The New England Journal of Medicine
Downloaded from nejm.org by Roy Jacobs on June 21, 2019. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

thiamine–responsive basal ganglia disease and biotinidase deficiency).[2,3] Moreover, biotin is frequently used as a supportive treatment in patients with disorders of mitochondrial energy metabolism. In these patients, doses are considerably higher (2 to 15 mg per kilogram of body weight per day) than the dietary reference intake in children (5 to 25 $\mu$g per kilogram per day).[4] The amount in over-the-counter dietary supplements varies considerably (up to 10 mg per tablet).

We report on six children receiving high-dose biotin treatment in the context of inherited metabolic diseases. Surprisingly, laboratory results suggestive of Graves' disease were found in all the patients during routine examination: excessively elevated levels of free thyroxine ($T_4$) and total triiodothyronine ($T_3$), low levels of thyrotropin, and elevated levels of anti–thyrotropin receptor antibodies (Table 1). Antithyroid medication was initiated in at least three children. However, only one child had symptoms attributable to hyperthyroidism (tachycardia, restlessness, and failure to thrive), and ultrasonographic scans of the thyroid, including Doppler flow studies, were unremarkable in all examined patients.

In search of a unifying explanation for this unusual phenomenon, we conducted a literature search, which revealed that biotin may interfere with the most commonly used thyrotropin and thyroid hormone assays.[5] The results were falsely increased or decreased according to whether a competitive method of measurement (for free $T_4$ and total $T_3$) or noncompetitive method (for thyrotropin) was used. In addition, biotin also interfered in a competitive manner with the method used for detection of anti–thyrotropin receptor antibodies. Together, these effects resulted in a laboratory pattern indistinguishable from that of Graves' disease. (Details on the methods are provided in the Supplementary Appendix, available with the full text of this letter at NEJM.org.)

After discontinuation of biotin treatment, interference with laboratory tests has been reported to disappear within 8 hours.[5] In our patients, thyrotropin and thyroid hormone levels were normalized 24 to 48 hours after the discontinuation of biotin, whereas levels of anti–thyrotropin receptor antibodies took up to 7 days to normalize.

Thus, high-dose biotin treatment can cause insidiously misleading laboratory results by fully mimicking the typical laboratory pattern of Graves' disease and sometimes persisting for several days after biotin application. In particular, patients with neurometabolic disorders may present with symptoms that can be easily misinterpreted in this context (e.g., failure to thrive and autonomic dysfunction with tachycardia and fever). This may lead to unnecessary antithyroid treatment and thereby cause unrecognized hypothyroidism that might be deleterious, especially in young children. In addition, biotin treatment potentially interferes with other streptavidin–biotin immunoassays. Although manufacturers are aware of this potential problem, this source of error is usually not referenced to the clinician in laboratory reports. Therefore, we believe that it is crucial to increase the awareness of this problem in the medical community.

Sebastian Kummer, M.D.
Derik Hermsen, M.D.
Felix Distelmaier, M.D.
Heinrich Heine University Hospital
Duesseldorf, Germany
felix.distelmaier@med.uni-duesseldorf.de

Disclosure forms provided by the authors are available with the full text of this letter at NEJM.org.

1. Said HM. Biotin: biochemical, physiological and clinical aspects. Subcell Biochem 2012;56:1-19.
2. Baumgartner MR. Vitamin-responsive disorders: cobalamin, folate, biotin, vitamins B1 and E. Handb Clin Neurol 2013;113: 1799-810.
3. Haack TB, Klee D, Strom TM, et al. Infantile Leigh-like syndrome caused by SLC19A3 mutations is a treatable disease. Brain 2014;137:e295.
4. National Academy of Sciences. Dietary reference intakes: vitamins (http://www.nationalacademies.org/hmd/~/media/Files/Activity%20Files/Nutrition/DRIs/DRI_Vitamins.pdf).
5. Kwok JS, Chan IH, Chan MH. Biotin interference on TSH and free thyroid hormone measurement. Pathology 2012;44: 278-80.

DOI: 10.1056/NEJMc1602096
*Correspondence Copyright © 2016 Massachusetts Medical Society.*

**THE JOURNAL'S WEB AND E-MAIL ADDRESSES**

To submit a letter to the Editor: authors.NEJM.org

For information about the status of a submitted manuscript: authors.NEJM.org

To submit a meeting notice: meetingnotices@NEJM.org

The *Journal's* web pages: NEJM.org

The New England Journal of Medicine
Downloaded from nejm.org by Roy Jacobs on June 21, 2019. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

# EXHIBIT E

# EXHIBIT E

We use cookies to enhance your experience on our website. By clicking 'continue'
or by continuing to use our website, you are agreeing to our use of cookies. You
can change your cookie settings at any time.

Continue

Find out more





# Suspected Testosterone–Producing Tumor in a Patient Taking Biotin Supplements 🔓

Heather M Stieglitz, Nichole Korpi-Steiner, Brooke Katzman, Jennifer E Mersereau, Maya Styner ✉

*Journal of the Endocrine Society*, Volume 2, Issue 6, June 2018, Pages 563–569,
https://doi.org/10.1210/js.2018-00069
**Published:** 10 May 2018     **Article history** ▾

📄 PDF     ▮▮ Split View     ❝ Cite     🔑 Permissions     ◂ Share ▾

## Abstract

A perimenopausal woman presented with palpitations, hirsutism, and inability to lose
weight. Laboratory tests revealed an unusual endocrine hormonal profile including
pituitary hormones (TSH, ACTH, and prolactin) below reference intervals and gonadal
(testosterone) and adrenal (cortisol) hormones above reference intervals. Ultimately,
after a comprehensive workup including a scheduled surgical procedure, abnormal
laboratories were determined due to biotin interference. Biotin (vitamin B7) is a water-
soluble vitamin and essential cofactor for the metabolism of fatty acids, glucose, and
amino acids. The recommended daily intake of biotin for adults is 30 μg/d. Many over-
the-counter products, particularly those marketed for hair, skin, and nail growth,
contain biotin 100-fold of recommended daily intake. This case is unique due to the
abnormalities observed not only in the well-described TSH "sandwich" immunoassay,
but also in tests for gonadal steroids, adrenal, and pituitary hormones. Falsely high as



Article Navigation

demonstrate falsely high results. Interference falsely lowers the immunometric "sandwich" immunoassay (Fig. 1B)—in this case, TSH. Biotin effect on our patient's endocrine testing led to decidedly abnormal findings, unnecessary medical referrals and diagnostic studies, and comprehensible psychological distress. Interference with one immunoassay, TSH, persisted a full 2 weeks after discontinuation of biotin; indeed, some tests demonstrate sensitivity to lesser quantities of biotin. Improved communication between patients, health care providers, and laboratory professionals is required concerning the likelihood of biotin interference with immunoassays.

**Keywords:**   biotin interference, cortisol, immunoassay, testosterone, thyroid stimulating hormone

**Issue Section:**   Reproductive Biology and Sex-Based Medicine

# 1. Case Report

A 48-year-old white woman presented to the endocrinology clinic with palpitations, inability to lose weight, and hirsutism. The referring provider queried whether these symptoms might be related to her known thyroid dysfunction. Subclinical hyperthyroidism, diagnosed 3 years prior, remained of unclear etiology; workup included a normal 24-hour I-131 uptake of 20%, a homogenous I-131 scan, and a negative thyroid-stimulating immunoglobulin. Antithyroid therapy was prescribed; however, each time the patient began therapy, this was discontinued due to weight gain and fatigue. Past medical history was notable for lifelong infertility, Roux-en-Y gastric bypass, tobacco use, and Factor V Leiden requiring chronic anticoagulation. Review of systems was notable for right hip pain due to arthritis, amenorrhea, and hirsutism, which was markedly worse for 6 months. Pertinent negatives included lack of acne, central adiposity, and hyperglycemia. Medications included bupropion 200 mg, calcium/vitamin D3 600-200, duloxetine 30 mg, topiramate 100 mg twice daily warfarin 15 mg, oxycodone 5 mg, and tapentadol 50 mg as needed for hip pain. She denied family history of thyroid disease, hirsutism, or endocrinopathies.

Physical examination demonstrated a blood pressure of 110/77, pulse of 90, height of 175.3 cm (5 feet 9.02 inches), weight of 96.8 kg, and body mass index of 31.50 kg/m$^2$. She was seated comfortably. No exophthalmos, chemosis, or lid lag were noted on ocular exam. Thick terminal hair was present on the upper lip, chin, and neck with a modified Ferriman-Gallwey

Skip to Main Content

Article Navigation

intact. No violaceous striae or oncholysis was noted. Reflexes were 2+ bilaterally, and she lacked a tremor.

Due to hirsutism, weight gain, and potential thyroid dysfunction, additional endocrine testing was pursued. Thyroid function tests again indicated subclinical hyperthyroidism (Table 1). The AM cortisol and total testosterone were elevated at 115 μg/dL and 232 ng/dL, respectively, whereas ACTH was low. FSH and LH concentrations were lower than expected for perimenopausal state. This multitude of aberrant hormone levels prompted an inquiry about potential use of medications and/or supplements. The patient disclosed that she was taking a biotin supplement at a dose of 5000 μg per day at initial presentation. She had been on a biotin supplement regularly for 6 months prior to initial presentation, but also endorsed using biotin intermittently for a period of about 5 years.

## Table 1.

Summary of Patient Test Results

| Test | Initial | Weeks After Initial Presentation | | | | Reference Interval | Method | Biotin Interferenc |
|------|---------|------|---|----|----|-------|--------|--------|
| | | 3.5 | 4 | 10 | 12 | | | |
| Pituitary | | | | | | | | |
| ACTH pg/mL | 8.3 (L) | 6.6 (L) | <5.0 (L) | | | 7.2–63 (AM draws) | Sandwich IA, Roche cobas e601 | Yes |
| FSH mIU/mL | 5.1 | 4.8 | | | 10.1 | Follicular 1.9–11.6, luteal 1.4–9.6 | Sandwich IA, OCD Vitros5600 | Yes |
| | | | | | | Postmenopausal 21.5–131.0 | | |
| LH mIU/mL | 1.8 | 1.4 | | | 7.8 | Follicular 2.6–12.1, luteal 0.8–15.5 | Sandwich IA, OCD Vitros5600 | Yes |
| | | | | | | Postmenopausal 13.1–86.5 | | |

Skip to Main Content

Article Navigation

| | 3.5 | 4 | 10 | 12 | | | |
|---|---|---|---|---|---|---|---|
| IGF-1 ng/mL | 73 ($z$ score: 1.04) | | | | 44–227 (age matched) | LC-MS, LDT | No |
| Prolactin ng/mL | <1.0 (L) | <1.0 (L) | | 1.5 (L) | 3.0–19.0 | Sandwich IA, OCD Vitros5600 | Yes |
| TSH mIU/mL | 0.06 (L) | 0.09 (L) | | 0.06 (L) | 0.6–3.3 | Sandwich IA, OCD Vitros5600 | Yes |
| TSH mIU/mL | | | | 1.1 | 0.3–4.3 | Sandwich IA, Beckman Coulter UniCel DXI 800 | No |
| **Thyroid** | | | | | | | |
| Free T3 pg/mL | 4.01 | 4.10 | | 4.07 | 2.71–6.16 (age matched) | Sandwich IA, OCD Vitros5600 | No |
| Free T4 ng/dL | 1.02 | 1.24 | | 0.97 | 0.7–1.4 | Sandwich IA, OCD Vitros5600 | No |
| **Adrenal** | | | | | | | |
| Cortisol µg/dL | 115 (H) | >123 (H) | 26.2[b] (H) | 2.9 | Before 10 AM: 4.5–22.7, after 5 PM: 1.7–14.1 (LDST < 1.8 µg/dl)[c] | Competitive IA, OCD Vitros5600 | Yes |
| Cortisol, salivary ng/dL | | <50 | | | 11 PM–12 AM: <100 | LC-MS/MS, LDT | No |
| Cortisol (free), urine µg/24 h | 25 | | | | 3.5–45 | LC-MS/MS, LDT | No |

Skip to Main Content

Article Navigation

| | | 3.5 | 4 | 10 | 12 | | | |
|---|---|---|---|---|---|---|---|---|
| DHEA-sulfate µg/dL | 21.1 | 28.9 | | | | 18–244 (age matched) | Competitive IA, IMMULITE 2000 | No |
| Androstenedione ng/dL | 23 (L) | 38 | | | | 30–200 | LC-MS/MS, LDT | No |
| **Gonadal** | | | | | | | | |
| Total testosterone ng/dL | 232 (H) | 184 (H) | | | 13.8 | 6–77 | Competitive IA, OCD VITROS 5600 | Yes |
| Total testosterone ng/dL | | | | 15 | 11 | 8–60 | LC-MS/MS, LDT | No |
| Free testosterone ng/dL | | | | 0.20 | 0.13 | 0.06–0.95 | Equilibrium dialysis, LC-MS/MS, LDT | No |
| **Other** | | | | | | | | |
| Biotin ng/mL | | | | 38 | 3 | Undefined | LC-MS/MS[d], LDT | No |
| SHBG nmol/L | | | | 51 | | 18–144 | Sandwich IA, IMMULITE 2000 | No |

Conversion factors to International System of Units (SI). ACTH: 0.2 pmol/L; IGF-1: 1.0 µg/L; free T3: 1.5 pmol/L; free T4: 12.9 pmol/L; cortisol: 27.6 nmol/L; cortisol, urine: 2.8 nmol; dehydroepiandrosterone-sulfate: 0.03 µmol/L; testosterone/androstenedione: 0.035 nmol/L; free testosterone: 34.7 pmol/L; FSH/LH/TSH: 1.0 IU/mL.

Abbreviations: DHEA, dehydroepiandrosterone; H, above the upper reference limit; IA, immunoassay; L, below the lower reference limit; LC-MS, liquid chromatography tandem mass spectroscopy; LDST, low-dose dexamethasone suppression test; LDT, laboratory-developed test; OCD, Ortho Clinical Diagnostics.

Article Navigation

<sup>b</sup> AM cortisol for low-dose dexamethasone suppression test.

<sup>c</sup> Low-dose dexamethasone suppression test AM cortisol <1.8 µg/dL (<49.7 nmol/L), per Endocrine Society clinical practice guidelines.

<sup>d</sup> Research use only.

View Large

Our patient's initial laboratory values were inconsistent with the clinical presentation and suggested biotin interference; she was, therefore, instructed to discontinue biotin in preparation for testing 3.5 weeks later. Surprisingly, these results similarly indicated an unusual hormone profile (Table 1). Due to a multitude of unexplained low pituitary hormone values, particularly her prolactin deficiency, which is rare and typically suggestive of pituitary pathology [1], a pituitary protocol MRI was performed to rule out a nonfunctioning adenoma. Pituitary Cushing disease was not part of the differential as the ACTH was low. Additionally, a CT scan was performed to rule out adrenal pathology. A low-dose dexamethasone suppression test revealed incomplete suppression of cortisol (26 µg/dL) [2], though the measured dexamethasone level was 44 ng/dL (expected 140 to 295 ng/dL after 1 mg dexamethasone), suggesting potential incomplete absorption. Urinary free cortisol and midnight salivary cortisol results were within reference intervals, which was discordant with serum cortisol findings, signifying possible elevation in cortisol binding globulin, as opposed to true hypercortisolemia (Table 1). The patient was referred to reproductive endocrinology to consider a potential testosterone-secreting tumor vs ovarian hyperthecosis as the source for the high testosterone. A pelvic ultrasound was unremarkable; however, a small testosterone-secreting tumor could not be ruled out, and hysterectomy with oophorectomy was recommended and scheduled.

Ten weeks after initial presentation, the patient's free and total testosterone were measured using liquid chromatography tandem mass spectroscopy (LC-MS/MS) and found to be within reference intervals (Table 1). Health care professionals in the laboratory were consulted regarding the differing measured testosterone concentrations. A pattern was identified consisting of aberrant hormones by competitive and immunometric immunoassays compared with normal hormone measurements by LC-MS/MS (Table 1). Notably, tests via LC-MS/MS are not prone to biotin interference. Collectively, these findings suggested potential biotin interference with immunoassay testing as a cause for the patient's aberrant hormonal profile. Ten weeks after presentation, our patient's sample was thus tested for

Skip to Main Content

Article Navigation

Upon further questioning, at 10 weeks, the patient admitted to continued use of biotin supplements. She agreed to discontinue biotin supplements for repeat testing. Two weeks later (*i.e.*, 12 weeks), the patient's serum total testosterone measured by immunoassay and LC-MS/MS were within reference intervals; additionally, her serum biotin concentration reduced to 3 ng/mL (Table 1). Most hormones measured using immunoassays (susceptible to biotin interference) normalized, except for TSH. Repeat TSH testing in the same sample was performed utilizing a different manufacturer's immunoassay that is not susceptible to biotin interference, which yielded a TSH concentration of 1.1 mIU/mL, within reference interval (Table 1). Clinical evidence suggests that the patient was, indeed, euthyroid.

## 2. Discussion

Seventy percent of older adults in the United States reported using more than one dietary supplement in the past 30 days [3]. Such patients may fail to share this information with medical providers. Supraphysiologic biotin concentrations in individuals ingesting biotin-containing supplements, exceeding the recommended daily intake of 30 μg, interfere with select laboratory tests, specifically immunoassays using biotinylated antibodies [4, 5]

Biotin interference with competitive immunoassays can cause falsely increased results, whereas biotin interference with immunometric "sandwich" assays falsely lowers results (Fig. 1). As shown in Fig. 2, our internal studies using residual patient-pooled serum matrix and exogenous biotin demonstrate that biotin interference causes marked positive bias in testosterone measured by a competitive immunoassay and marked negative bias in TSH measured by an immunometric "sandwich" assay (Fig. 2). As such, biotin interference is analyte-specific and method dependent and varies by manufacturer.

**Figure 1.**

Skip to Main Content

Article Navigation



View large          Download slide

Mechanism of biotin interference with immunoassay methodologies. Immunoassays in this case report contain a solid phase with a wash step that physically separates the label-bound analyte/antibody from the free label. Assays that contain this step are referred to as "heterogeneous" or "multistep" (vs homogeneous assays that do not contain a wash step). (A) Competitive immunoassays are comprised of exogenous biotin-conjugated antibodies that compete for binding with an analyte of interest in the patient's sample as well as exogenous labeled analyte. Complexes of biotin-antibody-analyte are captured to a streptavidin-coated well through strong interactions between biotin and streptavidin. A wash step removes any unbound materials. The exogenous labeled analyte is conjugated to an enzyme [*e.g.*, horseradish peroxidase (HRP)]. Substrate is added to the well and oxidized by horseradish peroxidase, producing a luminescence signal, measured by spectrophotometry. The measured signal is inversely proportional to the concentration of analyte in the patient's sample. Elevated concentrations of biotin in a patient's sample can compete with biotin-antibody-(labeled) analyte complexes for binding to the streptavidin-coated well. This leads to the detection of a diminished signal causing a falsely high analyte result. (B) Immunometric "sandwich" immunoassays contain an exogenous biotin-conjugated antibody and exogenous labeled antibody. Both antibodies bind to the same analyte of interest, forming a "sandwich". Biotin-antibody-analyte-labeled antibody complexes are captured to streptavidin-coated wells through strong interactions between biotin and streptavidin. A wash step removes any unbound materials. Exogenous labeled antibody is conjugated to an enzyme (horseradish peroxidase). Substrate is added to the well and oxidized by horseradish peroxidase, producing a luminescence signal proportional to the analyte's concentration. Elevated biotin in a patient's sample can compete with biotin-antibody-analyte-labeled antibody complexes for binding to the streptavidin-coated well. This leads to the detection of a diminished signal causing a falsely low analyte result. Horseradish peroxidase–labeled analyte, tracer-analyte; horseradish peroxidase–labeled antibody, tracer-antibody.

Skip to Main Content

**Figure 2.**

Article Navigation



View large      Download slide

Effect of biotin interference with measured analyte concentrations. Increasing concentrations (0, 10, 20, 30, 40, 50, 100, and 500 ng/mL) of exogenous biotin (Sigma Aldrich, St. Louis, MO) were added into aliquots of residual patient serum matrix. Samples were tested for total testosterone and TSH using competitive immunoassay and immunometric "sandwich" immunoassay methodologies, respectively (Ortho Clinical Diagnostics, Raritan, NJ;Vitros5600). Plots show measured (A) total testosterone and (B) TSH vs biotin concentration.

This is an unusual case of biotin interference with immunoassay testing for multiple tests, including total testosterone. In this patient's case, the initial test results were clinically misleading, prompting numerous consultations and unnecessary radiographic and laboratory testing. The negative clinical impact included weeks of psychological distress

Skip to Main Content

Article Navigation

procedure for a complex patient with a hypercoagulable state. Other cases of biotin interference with laboratory testing have been described, most of which involve interference with thyroid function tests [6−10]; however, the prevalence of biotin interference in laboratory testing remains unknown. A prior case of falsely elevated sex steroid hormones resulted in unnecessary surgery, highlighting the impact of this clinical problem [11]. Collectively, biotin interference with laboratory testing presents serious risks to patient safety and may lead to unnecessary testing/procedures and health care costs.

Until manufacturers modify immunoassays to resist biotin interference, strategies to mitigate patient harm from biotin interference are required. The US Food and Drug Administration recently issued a safety communication regarding biotin interference with laboratory tests, recommending a multidisciplinary approach for lessening risks (Food and Drug Administration, November 2017). Education as well as communication between laboratorians, providers, and patients is vital. Laboratorians can inform providers regarding test limitations including biotin interference with select tests, as well as develop protocols for investigating potential interference in suspected samples (*e.g.*, alternate testing procedures; biotin sequestration by streptavidin-coated microparticles) [4, 12]. Providers similarly can alert patients regarding biotin interference and inquire about supplement use. Patients are advised to discontinue biotin supplements prior to immunoassay testing, when feasible. In sum, unexpected laboratory results require providers and laboratory professionals to consider biotin interference. It is vital not only to recognize the interference, but also to prompt rigorous clinical and laboratory investigations regarding the prevalence of biotin interference and need for alternative laboratory assays.

## Abbreviation:

**LC-MS/MS**   liquid chromatography tandem mass spectroscopy

# Acknowledgments

*Financial Support:*   This work was supported by the National Institute of Arthritis and Musculoskeletal and Skin Diseases (AR062097 to M.S.) and the National Institute of Diabetes and Digestive and Kidney Diseases (P30 DK056350 to M.S.).

*Disclosure Summary:* The authors have nothing to disclose.

Article Navigation

1. Mukherjee A, Murray RD, Columb B, Gleeson HK, Shalet SM. Acquired prolactin deficiency indicates severe hypopituitarism in patients with disease of the hypothalamic-pituitary axis. *Clin Endocrinol (Oxf)* . 2003;59(6):743–748.

   Google Scholar      Crossref      PubMed

2. Nieman LK, Biller BM, Findling JW, Newell-Price J, Savage MO, Stewart PM, Montori VM. The diagnosis of Cushing's syndrome: an Endocrine Society Clinical Practice Guideline. *J Clin Endocrinol Metab* . 2008;93(5):1526–1540.

   Google Scholar      Crossref      PubMed

3. Gahche JJ, Bailey RL, Potischman N, Dwyer JT. Dietary supplement use was very high among older adults in the United States in 2011-2014. *J Nutr* . 2017;147(10):1968–1976.

   Google Scholar      Crossref      PubMed

4. Li D, Radulescu A, Shrestha RT, Root M, Karger AB, Killeen AA, Hodges JS, Fan SL, Ferguson A, Garg U, Sokoll LJ, Burmeister LA. Association of biotin ingestion with performance of hormone and nonhormone assays in healthy adults. *JAMA* . 2017;318(12):1150–1160.

   Google Scholar      Crossref      PubMed

5. Trambas C, Lu Z, Yen T, Sikaris K. Depletion of biotin using streptavidin-coated microparticles: a validated solution to the problem of biotin interference in streptavidin-biotin immunoassays. *Ann Clin Biochem* . 2018;55(2):216–226.

   Google Scholar      Crossref      PubMed

6. Barbesino G. Misdiagnosis of Graves' disease with apparent severe hyperthyroidism in a patient taking biotin megadoses. *Thyroid* . 2016;26(6):860–863.

   Google Scholar      Crossref      PubMed

7. Willeman T, Casez O, Faure P, Gauchez AS. Evaluation of biotin interference on immunoassays: new data for troponin I, digoxin, NT-Pro-BNP, and progesterone. *Clin Chem Lab Med* . 2017;55(10):e226–e229.

   Google Scholar      Crossref      PubMed

8. Minkovsky A, Lee MN, Dowlatshahi M, Angell TE, Mahrokhian LS, Petrides AK, Melanson SE, Marqusee E, Woodmansee WW. High-dose biotin treatment for secondary progressive multiple

9.  Elston MS, Sehgal S, Du Toit S, Yarndley T, Conaglen JV. Factitious Graves' disease due to biotin immunoassay interference-a case and review of the literature. *J Clin Endocrinol Metab* . 2016;101(9):3251–3255.

   Google Scholar        Crossref        PubMed

10. Batista MC, Ferreira CES, Faulhaber ACL, Hidal JT, Lottenberg SA, Mangueira CLP. Biotin interference in immunoassays mimicking subclinical Graves' disease and hyperestrogenism: a case series. *Clin Chem Lab Med* . 2017;55(6):e99–e103.

   Google Scholar        Crossref        PubMed

11. Langlois F, Moramarco J, He G, Carr BR. Falsely elevated steroid hormones in a postmenopausal woman due to laboratory interference. *J Endocr Soc* . 2017;1(8):1062–1066.

   Google Scholar        Crossref        PubMed

12. Lam L, Kyle CV. A simple method to detect biotin interference on immunoassays. *Clin Chem Lab Med* . 2017;55(6):e104–e106.

   Google Scholar        Crossref        PubMed

Copyright © 2018 Endocrine Society

This article has been published under the terms of the Creative Commons Attribution Non-Commercial, No-Derivatives License (CC BY-NC-ND; https://creativecommons.org/licenses/by-nc-nd/4.0/).

Sk



Article Navigation

---

**Email alerts**

New issue alert

In progress issue alert

Advance article alerts

Article activity alert

---

Receive exclusive offers and updates
from Oxford Academic

---

## Related articles in

Web of Science

Google Scholar

## Citing articles via

Web of Science (1)

Google Scholar

CrossRef

---

**Latest**     Most Read     Most Cited

Impact of long-term dexamethasone therapy on
the metabolic profile of patients with 21-
hydroxylase deficiency

Skip to Main ContentDecreased beta cell proliferation and vascular
density in a subpopulation of low-oxygenated
male rat islets

Article Navigation

diabetes: a brief report

Polycystic Ovary Syndrome: Pathophysiology, presentation, and treatment with emphasis on adolescent girls

Aldosterone-Secreting Adrenocortical Carcinoma Presenting with Cardiac Arrest

About Journal of the Endocrine Society

About the Endocrine Society

Editorial Board

Author Guidelines

Contact Us
Journals Career Network

Facebook

Twitter

LinkedIn

Recommend to your Library

Advertising and Corporate Services

Online ISSN 2472-1972

Copyright © 2019 Endocrine Society

## About Us

Contact Us

Careers

Help

Access & Purchase

Rights & Permissions

Open Access

## Connect

Join Our Mailing List

OUPblog

Twitter

Facebook

YouTube

Tumblr

## Resources

Authors

Librarians

Societies

Sponsors & Advertisers

Press & Media

Agents

## Explore

Shop OUP Academic

Oxford Dictionaries

Oxford Index

Epigeum

OUP Worldwide

University of Oxford

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide*



Copyright © 2019 Oxford University Press    Cookie Policy    Privacy Policy    Legal Notice

Site Map    Accessibility    Get Adobe Reader

# EXHIBIT F

# EXHIBIT F

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/232610311

# Positive and negative interference in immunoassays following biotin ingestion: A pharmacokinetic study

**Article** in Pathology · October 2012

DOI: 10.1097/PAT.0b013e32835a3c17 · Source: PubMed



CITATIONS
40

READS
2,593

3 authors:

Nilika Wijeratne
Monash University (Australia)
**64** PUBLICATIONS   **90** CITATIONS

SEE PROFILE

Zhong X Lu
Melbourne Pathology
**92** PUBLICATIONS   **1,620** CITATIONS

SEE PROFILE

James C G Doery
Monash University (Australia)
**155** PUBLICATIONS   **966** CITATIONS

SEE PROFILE

**Some of the authors of this publication are also working on these related projects:**

Project    Demodex View project

Project    Targeting lipids to modify cardiovascular risk View project

All content following this page was uploaded by James C G Doery on 19 February 2018.

The user has requested enhancement of the downloaded file.

Pathology (2012), 44(7), December



**Fig. 3** Small bowel contents, with beetroot fragments clearly visible.

Beetroot is a rare cause of bowel discolouration in the post-mortem setting. The presence of undigested fragments within the bowel lumen is normally obvious; however, due to increased availability and popularity of concentrated beetroot supplements (in powder, capsule or juice form), pathologists are well served to remember this possibility when confronted with a purple bowel of no obvious cause.

**Conflicts of interest and sources of funding:** The authors state that there are no conflicts of interest to disclose.

Cheng Liu*
Peter Smart†

*Healthscope Pathology, Bella Vista, and †Healthscope Pathology, Wagga Wagga, NSW, Australia

Contact Dr C. Liu.
E-mail: johnliu1985@hotmail.com

1. Mitchell SC. Food idiosyncrasies: Beetroot and asparagus. Drug Metab Dispos 2001; 29: 539–43.
2. Watson WC, Luke RG, Inall JA. Beeturia: its incidence and a clue to its mechanism. Br Med J 1963; 2: 971–3.
3. Eastwood MA, Nyhlin H. Beeturia and colonic oxalic acid. QJM 1995; 88: 711–7.
4. Watts AR, Lennard MS, Mason SL, et al. Beeturia and the biological fate of beetroot pigments. Pharmacogenetics 1993; 3: 302–11.
5. Klug E, Maxeiner H. Unusual coloration of intestinal contents. A surprising observation and its harmless explanation. Arch Kriminol 1981; 168: 129–32.
6. Cserni G, Kocsis L. The case of the purple colon. Virchows Arch 2008; 452: 703.

DOI: 10.1097/PAT.0b013e328359e167

# Positive and negative interference in immunoassays following biotin ingestion: a pharmacokinetic study

Sir,
We read with interest the recent report on biotin interference on thyroid stimulating hormone (TSH) and free thyroid hormone (fT4 and fT3) measurement by Kwok and colleagues,[1] which was similar to a case we reported previously.[2] Here, we would like to share our further experience of both positive and negative interference on a range of different immunoassays using different analytical systems and the time response curve following ingestion of biotin.

Our index patient was a 1-week-old baby born with features of liver failure and lactic acidosis who has been treated with biotin 30 mg per day (10 mg 8 hourly) since day 2 of life. At 1 week of age his thyroid function test (TFT) results on a Beckman DxI analyser (Beckman Coulter, USA) were: fT4 >77.7 pmol/L (reference interval 25–70), fT3 24.9 pmol/L (3.8–6.0) and TSH 3.75 mU/L (1.0–25.0). The discordant TFT pattern prompted further investigations to exclude assay interference. There was no change in results after treatment with Scantibodies (heterophile antibody blocking agent; Scantibodies Laboratory, USA). Furthermore, TFT results were normal when measured on Abbott Architect (Abbott, USA) and Siemens Centaur (Siemens, Germany) analysers, confirming assay interference specific to our Beckman DxI analyser. All results were reproducible at 1 month and 6 weeks of age. Biotin was then discontinued and all TFT results rapidly normalised.

To confirm the biotin interference in immunoassays and to examine the kinetics of the interference, one of the authors ingested 30 mg of biotin and blood samples were collected at 0, 1, 2, 4, 8 and 25 h following ingestion. Serum specimens were tested on Beckman DxI for fT4, fT3 and thyroglobulin, Abbott Architect analyser for fT4 and fT3, and Roche E170 (Roche, Switzerland) for DHEAS, oestradiol, testosterone and ferritin.

Our results showed that in competitive immunoassays based on biotin-streptavidin interaction, excess biotin in the specimen competes with the biotinylated analog for the binding sites on streptavidin resulting in falsely high values. This can be seen with fT4 and fT3 assays (Fig. 1A) on Beckman DxI. Testosterone, DHEAS and oestradiol on Roche E170 showed a similar pattern (data not shown). When the principle of biotin-streptavidin interaction is applied in the sandwich assay format, excess biotin in the sample displaces biotinylated antibodies resulting in falsely low results. This can be seen with the Beckman thyroglobulin (Fig. 1B) and the Roche E170 ferritin assays (data not shown). No interference was seen on the Abbott Architect fT4 and fT3 assays as biotin-streptavidin interaction was not used in the assay format.

The time response curve revealed that the interference peaked around 2 h post-biotin ingestion for all the analytes we measured. The effect lasted for approximately 5 h for DHEAS, oestradiol, testosterone and ferritin. However, interference for fT4 and thyroglobulin on Beckman DxI endured for up to 24 h. The magnitude of change in concentration is different among the analytes. fT3, DHEAS and testosterone showed a maximum 3-fold increase while fT4 increased by 7-fold. Thyroglobulin levels were decreased by 11-fold, however ferritin level dropped by only 1.5-fold. The most exaggerated effect was seen in the Roche oestradiol assay with a 138-fold increase from the initial value.

As mentioned by Kwok and colleagues, the biotin interference in immunoassay is not expected with normal dietary intake of biotin. However, high doses of biotin (5–20 mg daily) are used in several conditions such as biotinidase deficiency and propionic acidaemia. Many over-the-counter vitamin supplements also contain significant amount of biotin per tablet, for example, Swisse Ultiboost Hair Skin Nails, 2.6 mg biotin; Nature's Own Balance Plus Glow Multivitamin, 2.5 mg biotin; and Blackmore's Nails Hair and Skin tablets, 1.3 mg biotin. The usual recommended dose of the

Copyright © Royal College of pathologists of Australasia. Unauthorized reproduction of this article is prohibited.



**Fig. 1**   Interference of the ingested biotin on (A) fT4 and fT3, and (B) thyroglobulin assays on Beckman DxI.

above vitamins are one tablet per day. Subtle effects could be expected with these doses, but more pronounced if patients took two or three tablets at once. Therefore pathologists need to be aware of the possibility of biotin interference in immunoassays and require clear understanding of the assay formats to detect and overcome these interferences.

**Conflicts of interest and sources of funding:** The authors state that there are no conflicts of interest to disclose.

**Nilika G. Wijeratne***
**James C. G. Doery***†
**Zhong X. Lu***†

*Department of Pathology, Monash Medical Centre, Clayton, and †Department of Medicine, Monash University, Clayton, Vic, Australia*

Contact Dr N. G. Wijeratne.
E-mail: nilikaw@yahoo.com

1. Kwok JS-S, Chan IH-S, Chan MH-M. Biotin interference on TSH and free thyroid hormone measurement. *Pathology* 2012; 44: 278–80.
2. Wijeratne N, Doery JCG, Lu ZX. Pseudo-hyperthyroxinemia – uncommon cause of immunoassay interference due to biotin therapy. *Clin Biochem Rev* 2010; 31 (Suppl i): S34.

DOI: 10.1097/PAT.0b013e32835a3c17

Copyright © Royal College of pathologists of Australasia. Unauthorized reproduction of this article is prohibited.

View publication stats

# EXHIBIT G

# EXHIBIT G







**Clinical Laboratory News**

Subscribe to Clinical Laboratory News

This Month's Issue

CLN Stat

CLN Daily

CLN Industry Insights

Board of Editors

Permissions and Reprints

ACCENT CE Credit for CLN Articles

Contact Us

Advertise

# The Unintended Consequences of Biotin Supplementation: Spurious Immunoassay Results Lead to Misdiagnoses

**Bench Matters December 2016**

**Author:** Giuseppe Barbesino, MD  // **Date:** DEC.1.2016  //
**Source:** Clinical Laboratory News

**Topics:** Analytes, Universal Lab Issues, Preanalytical Factors, Hormones

Biotin, a water-soluble B-complex vitamin involved as a coenzyme in several critical carboxylation reactions, has become a popular over-the-counter supplement for its purported effects in strengthening hair and nails, controlling blood glucose levels, and easing peripheral neuropathy. While the National Academies of Sciences, Engineering, and Medicine's Food and Nutrition Board recommends daily adequate intake of 30 μg for adults, a typical biotin supplement contains 5,000–10,000 μg. Recently, some studies even have suggested that mega doses (100,000–300,000 μg daily) might be beneficial in multiple sclerosis and other neurodegenerative disorders.

This upsurge in biotin supplementation is having an unintended consequence: spurious immunoassay results in some patients. At least three papers have looked at this phenomenon, and my endocrinology colleagues and I are seeing more instances of it. However, I do not think the medical community at large is at all aware of this issue. Laboratorians







have an important role in consulting with physicians who see immunoassay results that do not match their patients' clinical presentation.

**A Very Strong Bond**

Two important chemical characteristics of biotin are behind this circumstance. First, biotin has a valeryl side-chain, allowing covalent bonds (biotinylation) to form easily with many small or large molecules, without significantly altering their antigenic or biologic properties. Second, biotin binds to a protein from Streptomyces avidinii—streptavidin—with the exceptionally low dissociation constant of 10-14. The biotin-streptavidin complex is one of the strongest non-covalent bonds observed in nature, about 1,000 times the affinity of the most potent antibody-hapten interaction, making it resistant not only to pH and temperature extremes but also solvents. Consequently, biotin and streptavidin are used in several immunoassays to ensure strong non-specific binding between chemicals of interest.

In sandwich assays, biotin covalently binds to an antibody specific for the analyte being tested; thyroid stimulating hormone (TSH), for example. This antibody is incubated with the serum sample and a second analyte-specific antibody linked to a reporter system, for example, ruthenium. The resulting biotinyl-antibody-analyte-ruthenium-antibody complexes precipitate on the solid phase coated with streptavidin. The ruthenium-generated signal is directly proportional to the amount of hormone present in the serum sample. A large excess of soluble biotin in the serum sample will compete for streptavidin with the biotin-linked antibody and therefore result in incomplete or no solid phase formation, and the reporter system will register a zero signal, interpreted as a falsely low hormone level.

Biotin excess also affects competitive assays, with the opposite effect. In this case, the serum analyte competes with its biotinylated version for binding sites on a specific antibody linked to ruthenium. The amount of biotinylated analyte-antibody-ruthenium complex precipitated on the streptavidin-coated solid phase is inversely proportional to the analyte's concentration in the sample. A large excess of biotin in the sample will prevent the solid phase formation and yield a low signal, interpreted as a falsely high analyte level.

Of recent reports about these interferences, the most striking involved patients diagnosed erroneously with Graves' disease. In these cases, mega dose biotin supplementation led to falsely low TSH levels in a sandwich-design assay and to markedly falsely elevated triiodothyronine (T3) and thyroxine (T4) levels, with highly positive TSH receptor antibody, in competitive assays. Remarkably, this combination of falsely



KRONUS

Neurological Autoimmunity

Immunoassay test kits for:
- Aquaporin-4 Autoantibody
- Acetylcholine Receptor Antibody
- Voltage-Gated Calcium Channel Antibody
- Voltage-Gated Potassium Channel Antibody†
- Titin Antibody†

† For Research Use Only. Not For Use in Diagnostic Procedures.
ISO 13485 : 2003 QMS Certified

WWW.KRONUS.COM
800 4 KRONUS

high and falsely low test results faithfully recapitulates the laboratory diagnosis of Graves' disease, raising no red flag. Only the discordance between these results and patients' asymptomatic clinical presentation have unmasked this potentially disastrous combination.

Other reports have described interference with thyroglobulin, parathyroid hormone, dehydroepiandrosterone sulfate, estradiol, and ferritin assays. The list of immunoassays potentially affected is longer and includes the whole catalog offered by some companies. Commercial platforms from Roche, Beckman, and ISYS all have been shown to be sensitive to the interference. The magnitude and duration of the interference is likely to be variable, and may depend on the patient's biotin supplement dose. In my practice, I saw from a sandwich assay the same markedly elevated T4 levels but normal sex hormone binding globulin level results. As described in a case report, in vivo experiments showed the interference disappearing 24 hours after a 10 mg dose. However, biotin interference may last longer in patients taking megadoses.

**Finding Solutions**

If markedly elevated thyroid hormone levels in the absence of hyperthyroidism symptoms raise suspicion, milder and less obvious cases are likely to go unsuspected. Consider the tests used for cancer screening and monitoring, such as prostate-specific antigen or thyroglobulin, for which there is no immediate clinical alarm bell for falsely elevated or falsely low results.

Are there any solutions to this problem? In my view, changes to assay design, such as the pre-absorption of all sera with streptavidin, are unlikely to be implemented in the near future, as they would be expensive. Awareness is the simple answer. Clinical laboratorians should update busy clinicians, unlikely to read laboratory bulletins, on this problem, while clinicians should build in their practice the habit of specifically questioning patients on biotin use.

*Giuseppe Barbesino, MD, is an assistant professor of medicine at Harvard Medical School and an endocrinologist at Massachusetts General Hospital in Boston.* **+Email**: gbarbesino@mgh.harvard.edu

# EXHIBIT H

# EXHIBIT H





News | Clinical Chemist

# Biotin Interference in Diagnostic Tests

Kelly Y. Chun

**DOI:** 10.1373/clinchem.2016.267286 Published January 2017

Article    Info & Metrics    📄 PDF

Despite sobering evidence of no benefit or even possible harm, the use of vitamin and mineral supplements by adults continues to grow. It is estimated that the US supplement industry is now costing consumers over $30 billion annually. Laboratorians have long had to contend with potential analytical interferences due to ingested substances. Now, biotin has become a pervasive interferent, increasingly insidious and problematic to clinical laboratory testing.

Biotin, also known as vitamin B7, is an essential coenzyme involved in carbon dioxide transfer in carboxyl reactions. The US Department of Agriculture–recommended Dietary Reference Intake (DRI)[2] of biotin is 3 day and supplementation is normally not necessary as biotin is ubiquitous in common foods. However, for the past several years, biotin has been marketed as a beauty supplement. One label on a biotin bottle reads, "For lustrous hair, radiant skin, and strong nails." Although these beauty claims are not well supported, biotin's popularity is at an all-time high due to heavy marketing and receptive consumers. Because over-the-counter biotin is not regulated and is sold as a beauty product, there are no records of the actual amounts that are being ingested, but many tablets contain upwards of 10 mg, suggesting that consumers are taking amounts of biotin far in excess of the DRI. The only medical evidence in support of megadoses of biotin (up to 300 mg per day, 10000 times the DRI) applies to patients with secondary progressive multiple sclerosis, in whom clinical symptoms and quality of life

have been improved by using biotin as a complementary medicine. High doses of biotin (5–30 mg per day) may also be indicated for rare metabolic disorders such as biotinidase deficiency and propionic acidemia.

Even in large doses, biotin is considered nontoxic and is unlikely to cause any side effects. The potential medical issue is that a large amount of biotin in a patient's sample can interfere with a broad range of diagnostic tests. Specifically, serum or plasma biotin may potentially impact any assay that uses biotin–streptavidin binding (**1**). Owing to streptavidin's extraordinarily high affinity for biotin [dissociation constant ($K_d$) of $10^{-14}$ mol/L] and binding under a wide variety of chemical conditions, biotin-streptavidin is a popular component of assay architecture for many molecular tests and immunoassay platforms.

Unfortunately, susceptibility to biotin interference is variable in magnitude and can skew results to be either falsely high or falsely low depending on the assay design and conditions. The ramifications for patients and caregivers are potentially grave. In typical competitive immunoassays for small molecules such as free thyroxine (fT4), free triiodothyronine (fT3), testosterone, estradiol, and cortisol, biotin interference blocks assay signal. Because signal is inversely proportional to analyte concentration in competitive assays, biotin can cause falsely high results. In the 2-site "sandwich" immunoassay format [typical for larger protein analytes such as thyroid-stimulating hormone (TSH), thyroglobulin, follicle-stimulating hormone (FSH), luteinizing hormone (LH), insulin, and for autoantibodies], excess biotin competes with the biotinylated complex causing a reduction in signal and a falsely lower result. This combination of 2 types of biotin interference can create the perfect factitious biochemical evidence of Graves thyrotoxicosis with highly increased fT4 and fT3, positive TSH receptor antibodies and suppressed TSH. Similar scenarios of biotin interference can be imagined for extremely high steroid hormone concentrations with suppressed LH or FSH, which would be suggestive of tumors.

A broad range of laboratory tests beyond endocrine assays may be impacted similarly by biotin-induced interference, which can give rise to either very confusing results or very compelling factitious results. Extreme laboratory test values as well as clinically discordant ones may be easily recognized as interferences, but subtle or moderate biotin-induced changes in results would not be identifiable by the laboratory. Even a slight skewing of results can pose serious ramifications for tests in which misdiagnosis of serious infectious diseases such as hepatitis C virus or failure to recognize a tumor recurrence may occur. Emergency room patients may be [...] biotin interferes with the assays for cardiac markers. Patients on thyroid medication may be titrated improperly owing to inaccurate but clinically congruous laboratory results. And the list goes on, and clinicians who recognize these problems will be looking to laboratorians for guidance.

While biotin interference in immunoassays has been known for years, it was a rare problem until biotin megadoses recently became commonplace. The ideal solution is to fix the biotin interference analytically, but this is a costly and a long-term proposition. Possible solutions may require removal of biotin in the assay design by pretreating samples with streptavidin or by adding biotin extraction steps. Such modifications will require extensive revalidation to demonstrate that performance is not affected. For now, laboratorians should become familiar with the availability of alternative assays that are free of biotin–streptavidin components to allow troubleshooting of discrepant results.

The practical and immediate solution to prevent or at least limit biotin interference will be to increase clinician and patient awareness of biotin's effects on tests. Physicians and other practitioners should inquire and advise patients to abstain from biotin intake for a few days before blood draw. This counsel is necessary although biotin has a very rapid elimination half-life of about 2 h; theoretically, most of it should clear from the body within 4–5 h. However, pharmacokinetic studies of a patient ingesting megadoses (30 mg) of biotin revealed that its interfering effects on laboratory tests persisted for up to 24 h. For patients on megadoses of biotin, this finding means that it is prudent to stop taking biotin for at least 2 days before blood draws.

With biotin use being so pervasive, it is critical that laboratorians and clinicians are aware of biotin interference so that misdiagnosis and inappropriate treatment can be prevented.

---

**Footnotes**

- ↵2 Nonstandard abbreviations:

  DRI,
  *dietary reference intake;*

  $K_d$,
  *dissociation constant;*

  fT4,
  *free thyroxine;*

  fT3,
  *free triiodothyronine;*

  TSH,
  *thyroid-stimulating hormone;*

  FSH,
  *follicle-stimulating hormone;*

  LH,
  *luteinizing hormone.*

- **Author Contributions:** *All authors confirmed they have contributed to the intellectual content of this paper and have met the following 3 requirements: (a) significant contributions to the conception and design, acquisition of data, or analysis and interpretation of data; (b) drafting or revising the article for intellectual content; and (c) final approval of the published article.*

- **Authors' Disclosures or Potential Conflicts of Interest:** *No authors declared any potential conflicts of interest.*

Received for publication September 28, 2016.

Accepted for publication November 15, 2016.

© 2016 American Association for Clinical Chemistry

---

## Reference

1. ↵Elston MS, Sehgal S, DuToit S, Yarndley T, Conaglen JV. Factitious Graves' disease due to biotin immunoassay interference—a case and review of the literature. *J Clin Endocrinol Metab* 2016;**101**:3251–5. **Google Scholar**

View Abstract

← Previous                                                          Next →

^ Back to top

## In this issue



Vol. 63, Issue 2
February 2017
Table of Contents
About the Cover
Index by author
Table of Contents (PDF)
Cover (PDF)
Advertising (PDF)
Ed Board (PDF)
Front Matter (PDF)
    Audio summary of this issue

---



🖨 Print                                   Tweet

↪ Share                              [ ♡ Like  43 ]

❶ Article Alerts                                      PDF

⟳ Citation Tools                                     Help

© Request Permissions

---

**▼ Related Articles**

*No related articles found.*

Scopus    PubMed    Google Scholar

**▶ Cited By...**

**▶ More in this TOC Section**

▶ Similar Articles

## Options

Home

About

Articles

Information for Authors

Resources

Abstracts

Submit

Contact

RSS

## Other Publications

The Journal of Applied Laboratory Medicine

© 2019 American Association for Clinical Chemistry

PDF

Help

# EXHIBIT I

# EXHIBIT I

# UPDATE: The FDA Warns that Biotin May Interfere with Lab Tests: FDA Safety Communication

This updated safety communication provides new information on biotin interference with certain troponin lab tests. For more information, refer to Biotin Interference with Certain Troponin Lab Tests (/medical-devices/vitro-diagnostics/biotin-interference-troponin-lab-tests-assays-subject-biotin-interference) for details on specific tests.

Date Issued: November 5, 2019

The U.S. Food and Drug Administration (FDA) is updating our 2017 safety communication to remind the public, health care providers, lab personnel, and lab test developers that biotin, often found in dietary supplements, can significantly interfere with certain lab tests and cause incorrect results that may go undetected. The FDA wants to make the public and health care providers aware about biotin interference with lab tests so that patients, physicians, and laboratories can work together to help prevent adverse events.

As noted in the original safety communication, while biotin in patient samples can cause falsely high or falsely low results, depending on the type of test, the FDA is particularly concerned about biotin interference causing a falsely low result for troponin, a clinically important biomarker to aid in the diagnosis of heart attacks, which may lead to a missed diagnosis and potentially serious clinical implications. The FDA continues to receive adverse events reports indicating biotin interference caused falsely low troponin results.

Since the FDA's safety communication on this topic in 2017, some lab test developers have been successful at mitigating the biotin interference of their assays, but others have not yet addressed it. The FDA remains concerned about troponin laboratory tests that have not addressed the risk of biotin interference. The FDA has posted a webpage on Biotin Interference with Troponin Lab Tests - Assays Subject to Biotin Interference (/medical-devices/vitro-diagnostics/biotin-interference-troponin-lab-tests-assays-subject-biotin-interference) to notify the public about troponin assays where the risk of biotin interference has not yet been addressed.

## Recommendations for Consumers

- Talk to your doctor if you are currently taking biotin (also called vitamin B7) or are considering adding biotin, or a supplement containing biotin, to your diet.

- Know that biotin is found in multivitamins, including prenatal multivitamins, biotin supplements, and supplements for hair, skin, and nail growth in levels that may interfere with laboratory tests.  However, the amount of biotin can vary significantly among

different products. Consider that the daily recommended allowance for biotin is 0.03 mg and that amount does not typically cause interference in lab tests

- Be aware that some supplements, particularly those labeled to benefit hair, skin, and nails, may have high levels of biotin, which may not always be clear from the name of the supplement. FDA is aware of many supplements containing 20mg of biotin, and some containing up to 100mg per pill, with recommendations to take multiple pills per day. Supplements containing high biotin levels may interfere with affected lab tests.

- Sufficient information is not available to know if stopping biotin consumption for any number of hours prior to testing will prevent incorrect test results.

- If you had a lab test done and are concerned about the results, talk to your health care provider about the possibility of biotin interference.

- For more information, see NIH Biotin Fact Sheet for Consumers (https://ods.od.nih.gov/factsheets/Biotin-Consumer/)

## Recommendations for Health Care Providers

- Talk to your patients about any biotin supplements or multivitamin supplements they are taking that may contain biotin, including supplements marketed for hair, skin, and nail growth.

- Know that biotin is found in multivitamins, including prenatal multivitamins, biotin supplements, and dietary supplements for hair, skin, and nail growth in levels that may interfere with lab tests.

- Be aware that many lab tests, including but not limited to cardiovascular diagnostic tests and hormone tests, that use biotin technology are potentially affected, and incorrect test results may be generated if there is biotin in the patient's specimen.

- Communicate to the lab conducting the testing if your patient is taking biotin.

- If a lab test result does not match the clinical presentation of your patient, consider biotin interference as a possible source of error.

- Report to the lab test manufacturer and the FDA if you become aware of a patient experiencing an adverse event following potentially incorrect laboratory test results due to biotin interference.

## Recommendations for Lab Personnel

- If you use assays with biotin technology, be aware that it is difficult to identify samples that contain biotin; therefore, it is important to communicate with health care providers and patients to prevent incorrect test results.

- If you are collecting samples in the lab, ask whether the patient is taking biotin or a biotin containing supplement.

- Educate health care providers about biotin interference with certain lab tests used in your lab.

- Consider that the daily recommended allowance for biotin is 0.03 mg for adults and these biotin levels do not typically cause significant interference. However, supplements containing high biotin levels including those marketed for hair, skin, and nail benefits, may contain up to 20 mg of biotin, and physicians may recommend up to 300 mg per day for conditions such as multiple sclerosis. Biotin levels higher than the recommended daily allowance may cause significant interference with affected lab tests.

- Be aware that specimens collected from patients taking high levels of biotin may contain more than 100 ng/mL biotin. Concentrations of biotin up to 1200 ng/mL may be present in specimens collected from patients taking up to 300 mg per day.

- Currently available data is insufficient to support recommendations for safe testing using affected tests in patients taking high levels of biotin, including about the length of time for biotin clearance from the blood.

- Communicate with the lab test manufacturer if you have questions about biotin interference.

- Be aware of certain troponin assays where the risk of biotin interference has not yet been addressed. See Biotin Interference with Troponin Lab Tests - Assays Subject to Biotin Interference.

## Recommendations for Lab Test Manufacturers and Developers

- If your assay uses biotin technology, contact the FDA to discuss biotin interference.

- Investigate interference from biotin (up to at least 1200 ng/mL biotin) in your assays that use biotin technology. Determine the lowest concentration of biotin that may cause clinically significant interference with your test(s).

- Communicate with your customers if they may be unaware that your test uses biotin technology and how it may be affected.

- Contact the FDA if you have any questions about biotin technology and interference.

## Biotin Interference with Certain Lab Tests May Lead to Incorrect Test Results

Many lab tests use biotin technology due to its ability to bond with specific proteins which can be measured to detect certain health conditions. For example, biotin is used in hormone tests and tests for markers of cardiac health like troponin. Biotin, also known as vitamin B7, is a water-

soluble vitamin often found in multi-vitamins, prenatal vitamins, and dietary supplements marketed for hair, skin, and nail growth.

Biotin in blood or other samples taken from patients who are ingesting high levels of biotin in dietary supplements can cause clinically significant incorrect lab test results. The FDA continues to see reports of adverse events, in addition to the one death reported prior to the 2017 safety communication, related to biotin interference with lab tests.

Incorrect test results may lead to inappropriate patient management or misdiagnosis. For example, a falsely low result for troponin, a clinically important biomarker to aid in the diagnosis of heart attacks, may lead to a missed diagnosis and potentially serious clinical implications. Prior to the 2017 safety communication, the FDA had received a report that one patient taking high levels of biotin died following low troponin test results when a troponin test subject to biotin interference was used.

The FDA is aware of people taking high levels of biotin that would interfere with lab tests. Many dietary supplements promoted for hair, skin, and nail benefits contain biotin levels up to 650 times the recommended daily intake of biotin. Physicians may also be recommending high levels of biotin for patients with certain conditions such as multiple sclerosis (MS). Biotin levels higher than the recommended daily allowance may cause interference with lab tests.

Patients and physicians may be unaware of biotin interference in laboratory assays. Even physicians who are aware of this interference are likely unaware as to whether, and how much biotin, patients are taking. Since patients are unaware of biotin interference, patients may not report taking biotin supplements to their physicians and may even be unaware they are taking biotin (for example, when taking products generally labeled for their benefits to hair and nails).

## FDA Actions

On November 28, 2017, the FDA issued a Safety Communication, The FDA Warns that Biotin May Interfere with Lab Tests (/medical-devices/safety-communications/fda-warns-biotin-may-interfere-lab-tests-fda-safety-communication), that discussed concerns with biotin interference in certain laboratory tests.

On November 5, 2019, the FDA published this updated Safety Communication because the FDA remains concerned about certain laboratory tests that have not addressed the risk of biotin interference.

In addition, the FDA also published a webpage Biotin Interference with Troponin Lab Tests - Assays Subject to Biotin Interference (/medical-devices/vitro-diagnostics/biotin-interference-troponin-lab-tests-assays-subject-biotin-interference) to notify the public about troponin assays where the risk of biotin interference has not yet been addressed.

The FDA continues to monitor reports of adverse events associated with biotin interference with laboratory tests and will update the public if significant new information becomes available.

## Reporting Problems to the FDA

If you suspect or experience a problem with a laboratory test while taking biotin, the FDA encourages you to report the problem through the MedWatch Voluntary Reporting Form (https://www.accessdata.fda.gov/scripts/medwatch/index.cfm?action=reporting.home).

Health care personnel employed by facilities that are subject to the FDA's user facility reporting requirements should follow the reporting procedures established by their facilities.

## Questions

If you have questions, email the Division of Industry Communication and Education (DICE) at DICE@FDA.HHS.GOV (mailto:DICE@FDA.HHS.GOV) or call 800-638-2041 or 301-796-7100.